**CAR CARRIERS, INC., et al., Plaintiffs,**

v.

**FORD MOTOR COMPANY and Nu-Car Carriers, Inc., Defendants.**

No. 82 C 7009.

United States District Court, N.D. Illinois, E.D.

April 1, 1983.

William R. Jansen, McConnel, Ruberry & Jansen, Chicago, Ill., for plaintiffs.

Sheldon Davidson and Jonathan B. Gilbert, Pederson & Houpt, Chicago, Ill., for defendant Nu-Car Carriers, Inc.

Michael K. Murtaugh and Thomas A. Doyle, Baker & McKenzie, Chicago, Ill., for defendant Ford Motor Co.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Car Carriers, Inc. ("Car Carriers"), its affiliate Clark Transport Company, Inc. ("Clark"), their controlling shareholder James P. Byrne, and four other related entities [1] bring a six-count Complaint

1. Other plaintiffs comprise JPB Corporation ("JPB"), Carrier Equipment Company ("Carrier Equipment"), Transco Corporation ("Transco"), and Tykely Investment Company

against Ford Motor Company ("Ford") and Nu-Car Carriers, Inc. ("Nu-Car"). Count I charges a conspiracy in violation of Sherman Act § 1 ("Section 1"), 15 U.S.C. § 1. All other counts assert pendent state law claims. Both Ford and Nu-Car have moved to dismiss (1) Count I for failure to state a cognizable antitrust claim and (2) Counts II–VI for lack of pendent jurisdiction. For the reasons stated in this memorandum opinion and order, their motions are granted.

### Allegations of the Complaint[2]

From 1968 until late October 1981 Car Carriers and Clark hauled all new Ford automobiles from Ford's assembly plants and railheads in Chicago. Though Clark may have provided haulaway transportation for other automobile producers as well, Car Carriers served only Ford. As to their Chicago traffic[3] both carriers operated under carrier authority issued by both the Interstate and Illinois Commerce Commissions. Their rates were therefore subject to the approval of those governmental bodies. Ford also "dictated and controlled" the tariffs by threatening either to oppose any disfavored rate applications or to take punitive action, such as termination. Complaint ¶ 19(d).

Some time during the mid-1970s Ford and some of its other carriers, including Nu-Car, E & L Transport Company ("E & L Transport"), Motor Convoy, Inc. ("Motor Convoy"), Auto Convoy Co. ("Auto Convoy") and Associated Transport, Inc. ("Associated"),[4] embarked on a campaign to terminate Car Carriers, Clark and some other carriers then serving Ford[5] and to force them to sell their businesses at cut-rate prices. That predatory scheme had five operative elements:

1. Ford induced each target carrier to invest heavily in new tractor-trailer rigs, real estate and new terminal facilities "with the promise of additional transportation traffic and complete agreement with increased tariff rates necessary to pay for" those acquisitions. Complaint ¶¶ 19(b) and (c).

2. Ford then precluded those carriers from obtaining rate increases sufficient to operate their expanded businesses profitably. Complaint ¶¶ 19(d) and (e).

3. With the cooperation of the non-target carriers, Ford "[i]nterfered with and prevented target haulaway carriers and their affiliates from selling their businesses and assets as going business concerns or prevented target haulaway carriers from consolidation or merger with other carriers." Complaint ¶ 19(h).

4. Ford then terminated its relationship with the disfavored carriers, assigning their traffic to the co-conspirator carriers.

5. At that point the favored carriers were in the position of acquiring the assets of the target carriers at distress prices. Complaint ¶ 19(i).

Though Car Carriers' demise generally tracked this scenario, some elaboration of its victimization is instructive. At the inception of the conspiracy in 1975, Ford directed Byrne to sell Car Carriers to someone who would not seek tariff rates as high as those sought by Car Carriers. Byrne then attempted to sell Car Carriers to co-conspirator E & L Transport. After they had executed a letter of intent, Ford induced E & L Transport to renege on the

("Tykely"). Byrne is the principal shareholder in JPB, which is in turn the parent of Car Carriers, Clark, Carrier Equipment and Transco. Tykely is a limited partnership between Byrne and members of his family.

2. This account fleshes out the Complaint somewhat by drawing on the expanded statements in plaintiffs' memorandum (though defendants rightly criticize plaintiffs for going beyond the Complaint on a Rule 12(b)(6) motion, this Court has indulged plaintiffs in that respect to

demonstrate they confront more than mere pleading deficiencies).

3. Clark also hauled cars from Ford's facility and railheads in Wayne, Michigan.

4. Nu-Car is the only co-conspirator carrier sued in this action.

5. In addition to plaintiffs, target carriers included Automobile Transport, Inc. ("ATI") and Dealers Transport.

deal by threatening to withhold Car Carriers' Chicago traffic from E & L Transport.

In 1977 and 1978 Ford ordered Car Carriers to purchase 80 new tractor-trailer rigs for $6 million, promising sufficient rate hikes to recover that investment. Though Car Carriers acceded to the demand, Ford thereupon stymied Car Carriers' efforts to obtain regulatory approval for the tariff increases.

In late 1979 Car Carriers attempted to bolster its financial posture by acquiring ATI, another target carrier. Ford not only blocked that consolidation initiative but also terminated ATI. Initially Ford divided ATI's business among Nu-Car, E & L Transport, Car Carriers and Clark. But within three months Ford transferred Car Carriers' share to E & L Transport.

In the summer of 1981 Ford solicited bid proposals from Car Carriers and other Ford Carriers for its Chicago haulaway business, all of which had been allocated to either Car Carriers or Clark. Ford awarded the business to Nu-Car "on the basis of a sham and knowingly predatory bid." Complaint ¶ 20(h).

Needless to say, plaintiffs' haulaway operations were then in shambles. Cut off from Ford, plaintiffs were unable to use their newly-purchased tractors and rigs and their terminal facility adjacent to Ford's Chicago plant. To minimize their staggering losses, plaintiffs attempted to sell the facility and other assets to Nu-Car at submarket prices. Negotiations were scuttled when Nu-Car at Ford's behest "insisted on 'walk-away' and other onerous provisions ... as well as unacceptable covenants and releases of claims of plaintiffs against Nu-Car, Ford and Associated Transport." Complaint ¶ 20(i). Instead, Nu-Car built its own terminal facility next to Ford's plant on land supplied by Ford.

### Count I

Count I really asserts a conspiracy encompassing two distinct conspiracies:

1. to exclude target carriers from the "market" for haulaway transportation of Ford cars and

2. to refuse to purchase, except at distress prices, the assets of the target carriers upon their termination.

However, neither of those aspects of the alleged overall conspiracy passes Rule 12(b)(6) muster.

More than one road leads to that destination. But the shortest one, the one that requires least discussion, is plaintiffs' lack of "antitrust standing" to recover treble damages under Clayton Act § 4, 15 U.S.C. § 15. And such standing is a threshold requirement that must be met, regardless of whether the substantive antitrust claim is grounded on a per se or rule of reason theory.

"Antitrust standing" concepts require a plaintiff to suffer the type of harm the antitrust laws were designed to recompense: "treble-damages recoveries should be linked to the pro-competition policy of the antitrust laws." *Blue Shield of Virginia v. McCready,* —— U.S. ——, ——, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982). *Accord, Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1979) (emphasis in original):

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Here the Complaint's allegations, coupled with plaintiffs' concessions in their responsive memorandum, foreclose *any* possibility of anticompetitive harm from either component of the putative conspiracy.

1. *Conspiracy To Terminate Plaintiffs*

Plaintiffs have really conceded the supposed conspiracy to squeeze them out was motivated solely by Ford's desire to replace high-priced suppliers (plaintiffs) with a low-priced one (Nu-Car):

1. Complaint ¶¶ 19(d) and (e) acknowledge Ford's resistance to the increased tariff rates proposed by plaintiffs.

2. Complaint ¶ 20(h) admits Ford diverted its Chicago traffic from plaintiffs to Nu-Car on the basis of the latter's lower (and allegedly "predatory"[6]) bid.

3. In embellishing on the assertion of Complaint ¶ 20(a) that Ford had ordered Byrne to sell Car Carriers, plaintiffs' Mem. 5 ascribes a procompetitive motive to Ford: Ford desired the sale of "Car Carriers to someone 'more suitable' . . . , because Car Carriers had requested Ford approval of what Ford considered unduly high tariff rates."

All this is of course a prototype of procompetitive rather than anticompetitive activity.

Indeed the conspiracy's procompetitive potential is a *necessary* consequence of the very structure of the allegedly restrained haulaway "market." According to the Complaint Ford not only is the sole consumer in the relevant "market" but also has sufficient economic power to dictate the terms (both price and quantity) of its dealings with all its carriers—targets and co-conspirators alike.[7] What plaintiffs really depict is Ford (the moving force in the conspiracy) acting in its own economic interest and terminating plaintiffs in order to lower its own transportation costs—a procompetitive benefit capable of being passed on via lower prices to the ultimate purchasers of Ford cars (the market in which Ford competes with all other car manufacturers). Accordingly plaintiffs' own assertions demonstrate conclusively their termination is not the type of anticompetitive injury the antitrust laws were intended to forestall.[8]

### 2. *Conspiracy To Boycott Plaintiff's Assets*

Count I's other alleged conspiracy—a collective refusal to purchase plaintiffs' assets except at distress prices—must also be dismissed for lack of "antitrust standing." Plaintiffs' asserted injury unquestionably flowed from the procompetitive aspects of the claimed boycott.[9] By allegedly precluding plaintiffs from selling their business to *existing* Ford carriers, this joint refusal to deal preserved plaintiffs as a potential rival (or forced them to sell to a new entrant),

---

**6.** Though this Court has accepted the "predatory" characterization arguendo, it is constrained to point out that label in antitrust idiom denotes more than just a lower bid. As the text hereafter indicates, all plaintiffs' other allegations, which portray Ford as the dominant figure able to control the prices it pays for haulaway services, belie the notion Nu-Car's lower-priced proposal was more than a competitive effort to capture new business. Plaintiffs may prefer to call that a "predatory" effort by Nu-Car, but it simply does not qualify for that term-of-art antitrust definition.

**7.** Plaintiffs' Mem. 4 concedes that Ford "effectively controlled the tariffs of its carriers" and that any carrier's attempt to evade such dominance "was dealt with severely by Ford, via termination or otherwise." See also Complaint ¶¶ 19(d) and (f) (Ford "dictated and controlled" such tariff rates so as to destroy the target carriers and bolster the non-target ones). Having unfettered control over the allocation of its traffic among those carriers with the requisite operating authority, Ford also determined the "quantity" of haulaway services provided by those carriers.

**8.** Even assuming the conspiracy to terminate plaintiffs could be labeled a "group boycott" (a concept ill-suited to the market structure portrayed in this case), the per se rule against such arrangements does not require this Court to presume the anticompetitive nature of plaintiffs' termination when they themselves have professed just the opposite. This is not the situation posed by a Complaint merely *silent* on that score. See *Klors v. Broadway-Hale Stores,* 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959) (allegation of group boycott states an antitrust claim even if unaccompanied by any assertion of anticompetitive purpose or effect). On the "group boycott" subject itself, the alleged agreement among suppliers of services (haulaway drivers) and the purchaser of those services (Ford—the alleged "market") differs substantially in market analysis terms from the usual alleged "group boycott" agreement among a manufacturer and parties (distributors or retailers) down the chain of distribution toward the ultimate consumer market. That issue did not have to be reached in the recent *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.,* 691 F.2d 241 (6th Cir. 1982) (upholding dismissal of a complaint alleging a conspiracy much like that claimed here, except that only *one* competing haulaway supplier was involved with the auto manufacturer).

**9.** As the text analysis indicates, the pejorative "group boycott" label fits no better here than it did at n. 8, albeit for a different reason.

and thereby intensified competitive pressures in the relevant market.

Indeed in the relevant antitrust sense of examining the effect on *competition* and not on *competitors* (plaintiffs),[10] a purchaser from plaintiffs at distress prices would (because of its own lower costs) be better able to compete with the remaining haulaway carriers for Ford's business.[11] *Cf. Havoco,* 626 F.2d at 558–59 (victim of alleged conspiracy remained a market force as a potential competitor).

\* \* \* \* \* \*

Thus neither conspiracy alleged in Count I states an antitrust claim that can survive defendants' motion to dismiss. Accordingly the entire count must be dismissed.

## Counts II–VI

This Court has jurisdiction over plaintiffs' state law counts only under the concept of pendent jurisdiction, for complete diversity between the parties is lacking. Because Count I has been dismissed, the remaining counts are no longer pendent to any federal claim and must fall as well. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## Conclusion

Ford's and Nu-Car's motions to dismiss are granted. Because Count I could not possibly be repleaded to withstand Rule 12(b)(6) onslaught,[12] this entire action is dismissed—Count I with prejudice and the other counts without prejudice.

**10.** *See Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697:
> The antitrust laws, however, were enacted for "the protection of *competition,* not *competitors,*" *Brown Shoe Co. v. United States,* 370 U.S. [294] at 320 [82 S.Ct. 1502 at 1521, 8 L.Ed.2d 510].

**11.** It should of course be emphasized that this entire analysis looks solely at the antitrust implications of the activities described in the Complaint. No holding is made or intended as to plaintiffs' possible recovery or non-recovery on a variety of common-law tort theories. Even on the assumption plaintiffs are right in that latter respect, the situation would then be as described by our Court of Appeals in *Havo-*

*co of America, Ltd: v. Shell Oil Co.,* 626 F.2d 549, 559 (7th Cir.1980):
> Havoco's complaint details a scenario of unsavory and reprehensible business practices, all of which are actionable in a state forum. We note our agreement with the district court's observation that "[i]t is hard to ignore the suspicion that the facts have been forced into an antitrust mold to achieve federal jurisdiction."

**12.** As already indicated at n. 2, this opinion has treated plaintiffs' assertions in the way most favorable to them. Their inherent internal flaws (in the antitrust sense) are non-curable.