Bryan MARTIN, Plaintiff,

v.

AMERICAN KENNEL CLUB, INC., et al., Defendants.

No. 87 C 2151.

United States District Court,
N.D. Illinois, E.D.

Sept. 28, 1988.

James G. McConnell, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

John H. Mathias, Jr., Jenner & Block, Chicago, Ill., Dale C. Christensen, Jr., Mark J. Hyland, Michael P. Enright, Seward & Kissel, New York City, Stephen J. Spitz, Sperling, Slater & Spitz, Laurie A. Sivek, Thomas S. Malciauskas, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Bryan Martin ("Martin") has sued American Kennel Club, Inc. ("American"), Fox River Valley Kennel Club, Inc. ("Fox River"), Dr. Peter Emily ("Emily") and various individual Fox River members, asserting:

 1. a violation of Sherman Act, § 1 ("Section 1," 15 U.S.C. § 1) and

 2. two pendent claims, one for violation of state law due process and the other for libel.

All defendants have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56.[1]

---

**1.** Defendant Corinne Kehoe ("Kehoe") is separately represented and has filed her own Rule 56 motion and supporting memoranda. All other defendants have proceeded jointly and have included a request for sanctions under Rule 11 as part of their supporting memoranda (Kehoe has not made such a request). This opinion addresses the Rule 11 issue briefly after discussing the merits under Rule 56.

For the reasons stated in this memorandum opinion and order:

1. Defendants' motions are granted as to the Sherman Act claim, which is dismissed with prejudice.

2. Both state law claims are dismissed without prejudice under the principles of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966).

### Facts[2]

American is a private corporation organized and existing under New York's not-for-profit laws, with its principal place of business in New York City. It was established to "adopt and enforce uniform rules regulating and governing dog shows and field trials ... and generally to do everything to advance the study, breeding, exhibiting, running and maintenance of the purity of thoroughbred dogs" (D.Jt. 12(e) ¶ 1 [3]). American's members are not individuals but local autonomous dog clubs, which through their delegates elect American's Board of Directors (*id.* ¶ 2).

Dog shows held under American's rules are conducted by local clubs. Those clubs are either members of American or are licensed by American to hold specific shows under American's rules. American does not itself conduct dog shows (*id.* ¶ 3).

Fox River is a corporation organized under the Illinois not-for-profit corporation laws, with its principal place of business in this state. It is an "all breed" club, meaning its membership and activities are not limited to any particular breed of dog. Members of Fox River are not required to own or exhibit dogs (*id.* ¶ 15).

On December 12, 1986 Fox River (not itself an American member club) held an American-sanctioned "all breed" dog show at the O'Hare Exposition Center in Rosemont, Illinois. Martin and his wife Nancy participated in that show as "professional handlers" (*id.* ¶ 28). That term describes someone who is paid a fee by a dog owner for exhibiting the dog on the owner's behalf (*id.* ¶ 11). Martin and his wife handled 18 dogs at the show, including two Samoyeds that participated in the Samoyed Best of Breed exhibition judged by Emily (*id.* ¶ 28).

That last-mentioned competition is the genesis of this suit. After individually examining and gaiting each of the 16 animals in the Best of Breed Class, Emily gestured toward the first dog in line, indicating he was the winner of the Best of Breed award (Emily Dep. 59–60).

Emily then turned with his arm partly outstretched toward the ring entrance. Some of the exhibitors apparently became confused, thinking the gesture indicated the two other awards in the class—Best of Winners and Best of Opposite Sex to Best of Breed. Some exhibitors, including Bryan and Nancy Martin, began to leave the ring (Emily Dep. 71; N. Martin Dep. 126, 132–33; B. Martin Dep. 166–77). Emily then said he had not finished judging and asked the exhibitors to resume their places in line (B. Martin Dep. 167–71). At the completion of the competition, Emily lodged a complaint with an American representative as to Martin's conduct, complaining that Martin had directed foul and abusive language toward him and had left the ring early without permission.

Emily's complaint was promptly referred to Fox River's Bench Show Committee (the "Committee"). That Committee comprised Fox River President Nan Hall Hamilton

---

2. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Martin (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

3. This District Court's General Rule 12(e) requires a party moving for summary judgment to submit a statement of material facts as to which there are no genuine issues. General Rule 12(f) then requires the nonmovant to respond by admitting or controverting each paragraph of the movant's statement. Here all defendants except Kehoe have submitted a joint statement ("D.Jt. 12(e)"). Citations to that statement in this opinion are to paragraphs admitted by Martin's response.

("Hamilton"), Fox River Vice-president Judith G. Cooper ("Cooper"), Fox River Corresponding Secretary Kehoe, Fox River members Marjorie Fish Emerson ("Fish," as she styles herself in her affidavit) and George Goodman ("Goodman"), and Fox River's Recording Secretary Susan Woody (D.Jt. 12(e) ¶¶ 16–17, 21–22, 31; Fish Aff. ¶ 3; Goodman Aff. ¶ 3), though Cooper ultimately recused herself. All Committee members (including Cooper) are named defendants here.

American publishes rules and guidelines addressing the situation where a person—while at a dog show held under American's rules—engages in "conduct prejudicial to the sport" (D.Jt. 12(e) ¶ 24). Infractions that may constitute conduct prejudicial to the sport include the use of abusive or foul language in a show ring, the expression of dissatisfaction with a judge's decision, altercations with show officials and mistreatment of a dog (*id.* ¶ 26). When conduct prejudicial to the sport occurs at a dog show, responsibility for investigating the charges rests with the officers of the club holding the show—in this case Fox River's Committee (*id.* ¶ 27).

In response to Emily's complaint, the Committee conducted a preliminary investigation. Martin disputed the charges, explaining that Emily looked at him while he was in the "downswing of a sneeze" and that Emily and other witnesses may have misinterpreted Martin's sneeze for foul language (*id.* ¶ 34). Two other witnesses gave statements to the Committee. Jeffrey Bennett (whose dog Drummer won the Samoyed contest) said he heard Martin refer to Emily as a "fucking asshole" (Bennett Dep. 24). Gary Griffin, who was sitting next to Bennett, testified he heard Martin use the words "Goddamit" and "shit" in the show ring immediately after Emily awarded the Best of Breed award (Griffin Dep. 22).

Based on that preliminary inquiry the Committee determined that such conduct, if proved, would indeed constitute conduct prejudicial to the sport and voted to hold a hearing the next day (December 13, 1986) to evaluate the merits of the charges. After that hearing the Committee ultimately found Martin had committed the alleged violations. Pursuant to American's regulations, Martin was suspended from all privileges of American.[4]

### Positions of the Parties

Martin now claims his suspension by the Committee violated Section 1. In that respect he advances two theories:

1. "The delegation of disciplinary authority over professional dog handlers to the unfettered discretion of competing handlers injures competition by intimidating prospective competitors from entering the business" (Cplt. ¶ 44).

2. Martin handles Great Pyrenees dogs owned by Alan Rappaport ("Rappaport") and his wife Anne. Hamilton and Cooper also own and show Great Pyrenees. From these two facts Martin develops the "Great Pyrenees conspiracy theory": Cooper and Hamilton, in combination with other members of the Committee, assertedly procured his suspension "for the purpose of eliminating or reducing the competition between their Great Pyrenees dogs and . . . Great Pyrenees dogs handled by [Martin]" (*id.* ¶ 29). Martin argues defendants' concerted refusal to deal with him constitutes either a "naked restraint of trade" (illegal per se under Section 1) or alternatively a group boycott (illegal under Section 1's rule of reason standard) (*id.* ¶¶ 42–43).

Defendants respond with three straightforward arguments:

1. American's rules and procedures for dealing with misconduct are not "predominantly anticompetitive" and thus are not illegal per se.

---

**4.** Martin's suspension ultimately lasted about 60 days (D.Jt. 12(e) ¶ 47). Martin Mem. 14 lays out in some detail what he contends are defects in the procedures employed in the hearing process. Because such claimed irregularities are irrelevant to the Sherman Act cause of action, they are omitted entirely from this opinion (*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 293, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) ("the absence of procedural safeguards can in no sense determine the antitrust analysis")).

2. Martin has no standing because he cannot establish an "antitrust injury."

3. American's rule is legal under the rule of reason standard.

"Antitrust injury" is a precondition to any suit under Section 1 and might therefore (because potentially dispositive) be looked at first. In this instance, however, the antitrust background is better framed by a preliminary examination of the scope of per se liability under Section 1. Accordingly this opinion will deal with matters in the sequence listed in this paragraph for defendants' contentions.

### Per Se Analysis

Section 1 declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states...." Certainly the Committee's decision to suspend Martin was a "restraint of trade" in the narrow sense that every commercial agreement restrains trade (*Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918)). But it has long since been a given that "the Sherman Act was intended to prohibit only unreasonable restraints of trade" (*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984)).

Some conduct is so predominantly anticompetitive that it is considered per se illegal. Such behavior involves "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use" (*Northwest Stationers*, 472 U.S. at 289, 105 S.Ct. at 2617, quoting *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). Put another way, "a *per se* rule is applied when 'the practice facially appears to be one that

would always or almost always tend to restrict competition and decrease output'" (*NCAA*, 468 U.S. at 100, 104 S.Ct. at 2959, quoting *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)). Examples of per se illegal conduct are price-fixing schemes, certain group boycotts, market allocations and tying arrangements (*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984) ("*Car Carriers II*")).

Martin Mem. 26 urges per se liability here. But he ignores substantial case law rejecting a per se approach in examining the legality of actions taken by sporting and trade associations. Most prominent is *NCAA*, where the Court applied rule of reason analysis to determine whether NCAA restraints on televising college football games were an unlawful horizontal restraint of trade. Although the ultimate result was invalidation of the NCAA television plan,[5] what is significant for present purposes is that the Court rejected a per se approach because "this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all" (468 U.S. at 101, 104 S.Ct. at 2960).

More recently, in *Northwest Stationers* the Court addressed the broader question "as to when *per se* antitrust analysis is appropriately applied to joint activity that is susceptible of being characterized as a concerted refusal to deal" (472 U.S. at 286, 105 S.Ct. at 2615). There the Court unanimously reversed the Ninth Circuit's application of per se analysis to a cooperative buying agency's expulsion of a member without procedural protections, saying (*id.* at 298, 105 S.Ct. at 2621):

a plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted activity to deal does not suffice because not all concert-

---

5. That plan limited the total amount of televised intercollegiate football and the number of games an NCAA member team might televise.

ed refusals to deal are predominantly anticompetitive.

Our own Court of Appeals too has consistently applied rule of reason analysis in the sporting and trade association context. *United States Trotting Association v. Chicago Downs Association, Inc.*, 665 F.2d 781 (7th Cir.1981) (en banc) ("*USTA*") rejected per se illegality for USTA rules prohibiting members from racing horses at meets sponsored by organizations that were neither USTA members nor USTA contract tracks. Noting that "the rule of reason [is] the standard traditionally applied for the majority of anticompetitive practices challenged under § 1 of the Act" (*id.* at 787, quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977)), *USTA, id.* at 789 (again quoting *Sylvania,* 433 U.S. at 49–50, 97 S.Ct. at 2557) went on to conclude "*per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." In language particularly relevant here, *USTA, id.* at 790 stressed:

> [I]n the context of organized sports and sanctioning organizations, courts should be hesitant to fasten upon tags such as "group boycott" and "*per se*" in order to preclude inquiry into the business necessity for or precise harm occasioned by particular rules or practices.[6]

Finally, this case is startlingly similar to *Brant v. United States Polo Association,* 631 F.Supp. 71 (S.D.Fla.1986). There Brant, an individual member of USPA and the owner of two member clubs, was suspended from participation in USPA events for alleged abusive language and behavior directed toward umpires. Like Martin, Brant alleged some members of the committee that sanctioned him were competitors. Like Martin, Brant alleged he was deprived of procedural due process. Like Martin, Brant sued on an antitrust claim and invoked per se liability for his suspension. On Brandt's motion for a preliminary injunction the District Court, citing *NCAA,* turned down the per se approach in favor of rule of reason analysis.[7]

■ Nothing in this case calls for per se treatment. It does not involve such traditionally per se illegal activities as price-fixing, market allocations or tying arrangements. Even on the premise that Martin's suspension could be labeled a group boycott, *Car Carriers II,* 745 F.2d at 1109 teaches such boycotts "are considered a *per se* violation only if they are used to enforce agreements that are themselves illegal *per se.*" Martin offers no evidence even suggesting any such illegal agreement. Moreover this context (like that in *NCAA* ) is one "in which horizontal restraints on competition are essential if the product is to be available at all" (*NCAA,* 468 U.S. at 101, 104 S.Ct. at 2960). Dog shows could not function in the absence of rules regulating the conduct of participants.

In sum, the controlling considerations are the *Northwest Stationers,* 472 U.S. at 298, 105 S.Ct. at 2621 admonition to use "care in application" of the per se rule, the total lack of any evidence that Martin's suspension or American's rule authorizing it is "likely to have predominantly anticompetitive effects" (*id.*) and the substantial case authority applying rule of reason analysis in the sport association context. Accordingly no per se rule will be applied to Martin's Section 1 claim.[8]

### Antitrust Injury

■ All that, however, simply shifts the substantive antitrust inquiry from a per se

---

6. [Footnote by this Court] Accord, *Moore v. Boating Industry Ass'ns,* 819 F.2d 693, 696 (7th Cir.1987), eschewing (in light of *Northwest Stationers*) a per se approach to a boat trailer manufacturers' association's dealings with boat trailer lamp manufacturers.

7. For other cases rejecting per se treatment, see, e.g., *Cha-Car, Inc. v. Calder Race Course, Inc.,* 752 F.2d 609, 613–14 (11th Cir.1985); *Deesen v.*

*Professional Golfers' Ass'n of America,* 358 F.2d 165, 170–71 (9th Cir.1966).

8. Martin's Mem. 26–27 cites *Northwest Stationers* for the proposition that American satisfies a "market power test," therefore bringing per se treatment into play. That is just a misreading of *Northwest Stationers* (especially in light of the *NCAA* opinion).

to a rule of reason analysis. But Martin must overcome a major hurdle before any such inquiry is launched. As this Court said in *Car Carriers, Inc. v. Ford Motor Co.,* 561 F.Supp. 885, 887 (N.D.Ill.1983) (*"Car Carriers I," aff'd* in *Car Carriers II*), quoting *Blue Shield of Virginia v. McReady,* 457 U.S. 465, 482, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982):

> [Antitrust] standing is a threshold requirement that must be met, regardless of whether the substantive antitrust claim is grounded on a per se or rule of reason theory.
>
> "Antitrust standing" concepts require a plaintiff to suffer the type of harm the antitrust laws were designed to recompense: "treble-damages recoveries should be linked to the pro-competition policy of the antitrust laws."

Needless to say, that notion did not originate with this Court. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1979) (emphasis in original) provides seminal teaching in this area:

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Martin just has not shown the requisite antitrust injury.

Martin Mem. 28 contends he need not do so in light of this year's decision in *Patrick v. Burget,* —— U.S. ——, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). That however reflects wholly misplaced reliance. *Patrick* posed the narrow issue "whether the state-action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), protects physicians in the State of Oregon from federal antitrust liability for their activities on hospital peer-review committees" (*id.* 108 S.Ct. at 1660). Nothing in the

*Patrick* discussion or decision implicated the question of antitrust standing. Rather the reinstatement of Patrick's jury verdict subsumed the existence of antitrust injury from his exclusion by defendants who were concededly his competitors in the relevant market.

Martin Mem. 28 alternatively asserts anticompetitive effects do exist in this case. To that end he points to what he characterizes as two independent markets, mentioned earlier in this opinion.

As for the professional handlers' market, no evidence (even with reasonable favorable evidence) tends to show the requisite injury to competition. Martin's suspension had no significant effect on either the supply of or demand for professional handlers' services. Prices remained the same—Martin concedes his suspension had no effect on the fees charged for handling dogs (B. Martin Dep. 271–72). Nor is Martin aware of any professional handlers who left their business or profession as a result of Martin's suspension (*id.* 253). True enough, there is the suggestion that Martin's former assistant Michelle Panno ("Panno") became so distraught over his suspension that she gave up her aspirations of becoming a professional handler (Panno Dep. 21–22). But even if so,[9] such an isolated incident is insufficient to raise a genuine issue of material fact as to market injury.

Moreover, the evidence shows that not one member of the Committee that suspended Martin was a professional handler (D.Jt. 12(e) ¶¶ 16–17, 21; Goodman Aff. ¶ 3; Fish Aff. ¶ 3; Kehoe 12(e) ¶ 6). Martin now concedes that (B. Martin Dep. 271). No earthly motive suggests itself for Committee members wanting to affect—to injure—the market for professional handlers.

In essence, Martin complains of an injury to himself alone. But as *Car Carriers II,* 745 F.2d at 1107 put it:

---

**9.** It is certainly questionable whether Panno's decision was actually caused by Martin's suspension. Panno testified (Dep. 17–18) she had wanted to work in Italy since December 1985, well before the suspension. Only 20 years old

even now, Panno is presently enrolled in college and living in Massachusetts. However, this opinion views the evidence in the light most favorable to Martin (see n. 2).

[T]he plaintiff must allege not only an injury to himself, but an injury to the market as well.[10]

*Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 655 (7th Cir.1984) stated the same concept at somewhat greater length:

The legislators who passed the Sherman Act did not make ordinary business torts federal torts for which treble damages could be recovered; no such wholesale displacement of state tort law into the federal courts was contemplated or desired.... Their concern, at least as it has been understood in recent cases, was with practices that by making the market less competitive hurt the people buying from or selling to the firms in those markets.[11]

No articulation of the notion puts it more pungently than the famous statement in *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)):

The antitrust laws, however, were enacted for "the protection of *competition, not competitors.*"

Martin has flat out failed to raise any genuine issue—either factual or legal—on the question of injury to competition in the professional handlers' market. One of his two showings has thus never had even a chance at a ribbon.

Undaunted, Martin Mem. 28 essays a second bite at the antitrust injury issue. Martin's assertion of the "Great Pyrenees conspiracy" theorizes that clients of his have curtailed their dog show campaigns as a result of the suspension. Thus Martin invokes a claimed injury to competition in the dog owning market—a market in which he is neither buyer, seller, breeder nor otherwise a direct participant—to establish the required antitrust injury. At least three flaws doom that idea.

Most simply, it is unsupported by the evidence. Martin relies solely on his own testimony that customers curtailed their dog show activities (B. Martin Dep. 263–65, 490, 493–94, 497–98, 582). But he has to do better than voice his conclusory assertions, wholly lacking in any factual underpinning, to create a genuine issue of material fact (cf. *Williams v. Williams Electronics*, 856 F.2d 920, 924 (7th Cir.1988) (in context of race discrimination suit under Title VII, plaintiff's unsupported self-evaluations are insufficient to avert summary judgment)).

And Martin's testimony is indeed devoid of any factual basis. Rappaport—the alleged target of the "Great Pyrenees conspiracy"—testified he had no evidence to support Martin's claim (Rappaport Dep. 50–51). More importantly, Rappaport testified that during Martin's suspension none of his dogs was withheld from competition (*id.* 256).

As an independent matter, the "Great Pyrenees conspiracy" contention—like Martin's first contention—also appears to identify (if anything at all) injury to competitors rather than to competition. Martin Mem. 3–5 and 6 adverts to some backbiting assertedly engaged in by Cooper and her husband Dick against the Rappaports and (on the other side of the rivalry) some dirty tactics Cooper believed Mrs. Rappaport had engaged in during an earlier dog show. But Martin's discussion of "Damages and Injury to Competition" (Mem. 21) says not a word as to how the "Great Pyrenees conspiracy" impacted competition rather than Cooper's claimed competitors, the Rappaports. There is no attempt at all to identify the relevant market or how it could have sustained any material adverse effect. And the same is true of Martin's "Argument" section dealing with the Sherman Act (Mem. 22–29), except for some few nonparallel comparisons of the facts here

---

**10.** [Footnote by this Court] *Car Carriers II* spoke of what a "plaintiff must allege" because it dealt with pleading requirements in the context of a Rule 12(b)(6) motion. Of course the ingredients of what a plaintiff must prove—in the sense of at least creating an issue of material fact for Rule 56 purposes—are identical.

**11.** [Footnote by this Court] See also *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir.1980) ("a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market").

with those in *Patrick.* In sum, Martin's claim is totally empty on this score as well.

But even if the evidence had established (as it does not) an injury to competition in some relevant market (say that of dog owners), Martin cannot use that to establish *his own* "antitrust injury." That is the third fatal defect in his "Great Pyrenees conspiracy" theory: He is not a participant in the dog owning market and thus cannot qualify as the "target" of the alleged conspiracy. *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1168–69 (7th Cir.1978) adopted the "target area" test for determining antitrust injury. *In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir. 1982) has reconfirmed and summarized that test, which (*id.* at 516):

> focuses on the anticompetitive conduct, requiring that the plaintiff be within the area of the economy which was endangered by a breakdown of competition and that plaintiff's injury be a direct result of the lessening of that competition.[12]

Under Martin's "Great Pyrenees" theory, the only arguable targets of the claimed conspiracy are dog owners (specifically Rappaport), not professional handlers such as Martin. *Industrial Gas, id.* at 519 might have been written to describe Martin:

> [W]hile he may have some injury-in-fact, he was not the target of the alleged anticompetitive practices. His injury,

therefore, did not result from the defendants' acquisition or exploitation of market power.

### Rule of Reason

Martin's failure to raise a genuine issue of fact on the antitrust injury issue trashes his Section 1 claim. Out of what is undoubtedly a superabundance of caution, this opinion nevertheless turns briefly to a second and independent basis for dismissal: American's rule unquestionably passes muster under rule of reason analysis.

By now it is old hat that the rule of reason calls on the trier of fact "to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition" (*Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982)).[13] Our own Court of Appeals "has consistently held that in all Section 1 rule of reason cases the plaintiff must show that the challenged restraint has an adverse impact on competition in a relevant market" (*Dos Santos v. Columbus–Cuneo–Cabrini Medical Center*, 684 F.2d 1346, 1352 (7th Cir.1982), citing *USTA* ).

 Martin has presented nothing at all to evidence any adverse impact on competition in a market. American's rule authorizing Martin's suspension is facially neutral,

---

**12.** [Footnote by this Court] *Industrial Gas* held a terminated employee who refused to participate in alleged price fixing schemes suffered no "antitrust injury" because he was not a "target" of the alleged conspiracy. Moreover, the employee was also ruled not a proper party because his injury was too remote from the alleged illegal conduct (*id.* 519–20). That same analysis applies with equal force to Martin, providing still another ground for dismissing his claim. On the issue of remoteness, see generally Areeda and Turner, *Antitrust Law II* § 340e, at 217 (1978):

> [A] non-competitor is usually denied standing to complain that he was injured by selling less to one who was injured by the defendant's alleged antitrust violation. In this category are those who supplied employment services. . . .

**13.** Perhaps the most famous formulation of the rule of reason is Justice Brandeis' in *Board of Trade*, 246 U.S. at 238, 38 S.Ct. at 244:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

designed to preserve the integrity of the sport of thoroughbred dog breeding and shows. As such, it is *procompetitive.* Martin himself admits (B. Martin Dep. 213) the necessity for rules governing unsportsmanlike conduct.

By definition no dog shows could take place in the absence of rules and procedures designed to preserve order. All organized sports associations have rules regulating the conduct of participants. American's regulation is an excellent example of a rule that "merely regulates and ... thereby ... promotes competition" (*Board of Trade,* 246 U.S. at 238, 38 S.Ct. at 244, quoted in *Dos Santos,* 684 F.2d 1352).[14] It is clearly valid under the rule of reason.

### Pendent Claims

■ In the absence of total diversity of citizenship (not present here), this Court's jurisdiction over Martin's state law claims exists only under pendent jurisdiction notions. *UMW v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted) teaches:

14. Martin argues the alleged lack of procedural due process afforded him bears on the Section 1 claim. Not so (see n. 4). At best Martin could contend such facts, if proved, evidence anticompetitive motive or intent. But because he proffers no affirmative evidence suggesting such animus or motivation, this Court will draw no such inference.

15. This Court has frequently pointed out (though for a very different reason) that summary judgment is a substitute for trial—or more accurately a demonstration that no trial is needed because no material factual issues require resolution (see, e.g., *Teamsters Local 282 Pension Trust Fund v. Angelos,* 649 F.Supp. 1242, 1252 (N.D.Ill.1986)).

16. This opinion had already been completed when this Court received, as part of its weekly package of slip opinions from our Court of Appeals, the September 12, 1988 opinion in *Zepik v. Tidewater Midwest, Inc.,* 856 F.2d 936 (7th Cir.). There the court, after upholding a summary judgment on the single federal-question claim, remanded the variety of pendent claims for consideration of a potential *UMW v. Gibbs* dismissal (id. at 944–946), rather than upholding the District Court's summary judgment disposition of those claims on the merits. Although this Court (as the text reflects) applies a *UMW v. Gibbs* analysis as a matter of course in such

Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*Car Carriers I,* 561 F.Supp. at 889 applied that principle in the plainly appropriate context of a Rule 12(b)(6) dismissal of the lone federal-question claim (there, as here, asserted under the antitrust laws).

It is true that a Rule 56 summary judgment dismissal normally comes at a later stage in the case, when the facts have most often been fully developed.[15] That might sometimes make the *UMW v. Gibbs* suggestion less compelling, for the court granting summary judgment on the federal-question claim could well be in a position to decide the state claims with a minimum of added effort.[16] But pendent claim dis-

situations, *Zepik* does not appear to recognize the meaningful difference that frequently exists between (say) a dismissal of federal claims under Rule 12(b)(6) (failure to state a claim) or Rule 12(c) (judgment on the pleadings) on the one hand and under Rule 56 (summary judgment) on the other. Although each of those involves a dismissal "before trial" (*UMW v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139) in literal terms, the only reason that is an accurate description of a Rule 56 dismissal is that there will never be a "trial"—an in-court proceeding with live witnesses—in any event. But if the trial court already knows everything that would be known at such a trial, and if the only reason that no trial will be held is that no triable factual issues require one, it would seem that what *UMW v. Gibbs, id.* says should "certainly" happen—dismissal of the state claims—should not be taken literally (it is worth noting the *UMW v. Gibbs* statement was a classic example of dictum, for the case there had involved a disposition of the pendent state claim *in* (not before) a full-blown trial, and the Court *upheld* the District Court's having dealt with that claim on the merits (383 U.S. at 729, 86 S.Ct. at 1140)). At a minimum it would appear that applying a "strong presumption" in favor of state-claim dismissal in the summary-judgment full-record context (*Baltimore Orioles, Inc. v. Major League Baseball Players' Association,* 805 F.2d 663, 682 (7th Cir.1986), relied on in *Zepik,* 856 F.2d at 945) overstates the case substantially. If any-

missal may also follow the granting of summary judgment, and that course is clearly called for here:

1. There is a great deal of analysis demanded on the pendent claims beyond what has occupied this Court to this point (for example, the reply memorandum of defendants other than Kehoe devotes fully 10 pages (Jt.R.Mem. 14–24) to Martin's Count II state-due-process claim, and Kehoe's original memorandum spends 11 pages (Kehoe Mem. 17–27) on Martin's Count III libel claim). Certainly those "state issues substantially predominate [both] in terms of proof [and] of the scope of the issues raised" (*UMW v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139).

2. If Martin were to opt for refiling his state law claims in a state court, all the discovery to this point would be available there and therefore would not be wasted. And of course a state forum is preferable for the resolution of state law claims—especially if they call for the extension of state law doctrines (see, e.g., *Gust K. Newberg Construction Company v. E.H. Crump & Company*, 818 F.2d 1363, 1368 (7th Cir.1987)).

3. Defendants other than Kehoe have themselves suggested dismissal of the pendent claims under *UMW v. Gibbs* (Jt. Mem. 26 n. 11).

4. Finally, this Court is certainly disinclined to pursue the analysis of Counts II and III—unnecessary in federal jurisdictional terms—solely because it might be relevant for a portion of the treatment on defendants' Rule 11 motion.

Accordingly this Court heeds the generally applicable counseling of *UMW v. Gibbs*. Counts II and III are dismissed without prejudice.

### Rule 11 Sanctions

All defendants except Kehoe have moved for sanctions against Martin under Rule 11. Martin Mem. 35–36 gives a brief and thoroughly unsatisfactory response.

First, Martin says the Rule 11 request is not properly before this Court because defendants' summary judgment motion did not request sanctions. That procedural argument, submitted without supporting authority, is without merit.

As for the substance of the Rule 11 request, Martin's counsel really does not come to grips with the need to demonstrate objective good faith for the assertion of the antitrust claim, in terms of both a prefiling factual investigation and a prefiling legal analysis.[17] For that reason Martin's counsel is ordered to file a memorandum on the subject on or before October 11, 1988. There will be a status hearing at 9 a.m. October 20, 1988 to discuss further procedures on the subject.[18]

### Conclusion

Martin has failed to establish any genuine issue of material fact requiring trial on his Sherman Act claim. All defendants are entitled to a judgment as a matter of law in that respect. Accordingly the Sherman Act claim is dismissed with prejudice. Martin's two state law claims are dismissed without prejudice. Finally as to defendants' motion for sanctions under Rule 11:

1. Martin's counsel is ordered to file a further memorandum on or before October 11, 1988.

2. There will be a status hearing at 9 a.m. October 20, 1988.

---

thing, the presumption in that kind of situation probably ought to go the other way. As the ensuing text discussion—written before *Zepik*—reflects, however, presumptions (really tie-breaking rules) play no part in this case. Several reasons counsel leaving Martin's state claims to a state court—that is, if he chooses to refile them at all, rather than retiring to lick his wounds.

17. By limiting the inquiry to the antitrust claim, this order expects Martin's counsel to clear

away the really irrelevant factual underbrush that clutters up Martin Mem. 35–36, addressing instead the matters that bear upon the reasonably understood facial viability of the *federal* claim when Martin brought it.

18. Among the matters to be considered will be the appropriate disposition of the Rule 11 claim to the extent defendants' counsel have extended time and incurred expense on the Count II and III claims.