Harold VOGEL, Plaintiff-Appellant,

v.

AMERICAN SOCIETY OF APPRAIS-
ERS, et al., Defendants-Appellees.

No. 83–3218.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1984.

Decided Sept. 20, 1984.

As Amended Oct. 31, 1984.

experienced gem appraiser, charges a flat one percent fee, subject to a minimum fee of $10. He was a member of the principal (and to simplify this opinion we shall pretend the only) defendant, the American Society of Appraisers, until it expelled him pursuant to a bylaw of the Society which states "that it is unprofessional and unethical for the appraiser to do work for a fixed percentage of the amount of value ... which he determines at the conclusion of his work." His expulsion, published in the Society's newsletter on March 1, 1983, caused Vogel to lose referrals from members of the Society and from other appraisers. (Appraisers specialize—Vogel, for example, in gems—and therefore an appraiser will sometimes refer a customer to another appraiser.) Vogel brought this suit under section 1 of the Sherman Act, 15 U.S.C. § 1, alleging that the bylaw constituted a price-fixing agreement among the members of the Society and that his expulsion from the Society constituted a boycott of him by the members. He moved for a preliminary injunction that would have required his reinstatement pending the decision of the case on the merits. This was denied, and he appeals the denial under 28 U.S.C. § 1292(a)(1).

The Society argues that Vogel has not shown irreparable harm and therefore is not entitled to an injunction, regardless of the merits of his suit. Although irreparable harm is (with minor and irrelevant exceptions) one of the prerequisites to obtaining a preliminary injunction, all it means is that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial. See *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970) (Friendly, J.). This Vogel has shown. The consequences of his public expulsion from the appraisers' society will be hard to monetize for purposes of admeasuring damages but cannot be assumed to be trivial. True, there are methods of estimating a business loss due to an exclusionary act—for exam-

Daniel Galatzer, Lamet, Galatzer & Assoc., Chicago, Ill., for plaintiff-appellant.

Robert Marc Chemers, Pretzel & Stouffer, Chicago, Ill., for defendants-appellees.

Before POSNER and FLAUM, Circuit Judges, and GORDON, Senior District Judge.[*]

POSNER, Circuit Judge.

This is an antitrust case of Doric simplicity—yet some difficulty. Harold Vogel, an

[*] Hon. Myron L. Gordon, of the Eastern District of Wisconsin, sitting by designation.

ple, by comparing the plaintiff's profits before and after the act occurred—but the methods often are unreliable because of the difficulty of correcting for other things happening at the same time that may have affected those profits. See Note, *Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business,* 80 Harv.L.Rev. 1566, 1577–86 (1967). And true, Vogel will be reinstated if he wins his case on the merits. But the losses he will suffer in the meantime are irreparable harm—less harm than in some other preliminary-injunction cases, no doubt, but it could still be much greater than the harm to the defendant if the injunction were granted; and in that event the net harm from denial would clearly exceed the net harm from grant. In fact, the Society does not contend that reinstating Vogel temporarily would harm it in the slightest.

■ So Vogel has some equity in his application for a preliminary injunction—but maybe not much. He argues that his right to permanent relief probably will appear as soon as he moves for summary judgment. This implies that when the district judge ruled on the application for a preliminary injunction the period of irreparable harm was expected to be brief and the amount of that harm therefore quite limited. There was no long-dragged-out trial in the offing during which the plaintiff's losses would be mounting up. Where the imbalance of harms is very great, the plaintiff is entitled to a preliminary injunction upon a showing just of a modest prospect of success on the merits. But if the balance is closer, whether because each party, or neither party, can show substantial harm if the ruling on the application for preliminary injunction goes against him, the plaintiff must show a greater likelihood of success in order to get the injunction. See *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982); *American Hospital Ass'n v. Harris,* 625 F.2d 1328, 1331 (7th Cir. 1980); *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir.1973) (per curiam). So it becomes important to inquire whether

Vogel has a good chance, not just some chance, of winning this suit.

■ In considering his chances, we need not assess the boycott allegations separately. A boycott is illegal per se under the antitrust laws only if used to enforce a rule or policy or practice that is itself illegal per se. See *Wilk v. American Medical Ass'n,* 719 F.2d 207, 221 (7th Cir.1983); *Bruce Drug, Inc. v. Hollister, Inc.,* 688 F.2d 853, 859–60 (1st Cir.1982); *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1367–69 (5th Cir.1980). In the Supreme Court's first case holding that a boycott was illegal per se, *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), an association of lumber retailers had blacklisted wholesalers who had the temerity to compete with the members of the association by selling directly to consumers (that is, to the retailers' customers). The boycott was a method of enforcing a patently anticompetitive horizontal conspiracy and therefore was itself illegal per se. But if a rule of a private association is not illegal per se, neither is the enforcement of the rule, see *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n, Inc.,* 672 F.2d 1280, 1285–89 (7th Cir.1982), as by expelling a noncomplying member—the normal method by which a private association enforces its rules.

If the bylaw forbidding members of the American Society of Appraisers to charge for appraisal on a fixed-percentage basis is a form of price fixing, it is illegal per se and Vogel, as a victim of illegal price fixing and an illegal boycott, would be entitled to reinstatement. It is not hard to find judicial statements to the effect that any interference with price brought about by an agreement between competitors is illegal price fixing. The best-known example is *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940): "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the

members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." And for a notable application of this formulation of the per se rule see *Plymouth Dealers' Ass'n v. United States*, 279 F.2d 128 (9th Cir.1960). Although not all of the 4,500 members of the American Society of Appraisers compete with each other, some of the 63 gem appraisers who belong to the Society probably do, though all we really know is that four of the gem appraisers have their places of business in Illinois, as does Vogel. We shall assume for now, but return to the point later, that the bylaw is an agreement among competitors in a sense relevant to this suit; and in a literal sense, at least, the bylaw did "tamper" with a "price structure."

 But judicial language about the per se illegality of competitors' tampering with price must, like all legal language, be read with sensitivity to its context. In general, the only types of horizontal price agreements that the antitrust laws have been held to forbid are those that have the purpose or likely effect of raising price above the competitive level. See *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 446 n. 22, 98 S.Ct. 2864, 2875 n. 16, 2878 n. 22, 57 L.Ed.2d 854 (1978). The classic example is the sellers' cartel, or price-fixing conspiracy (a covert cartel), which agrees to raise price above the competitive level or, what has the same competitive effect, to divide the market into exclusive territories, thus preventing the members from competing with each other. Sometimes competitors agree to discontinue particular forms of price competition, such as competition in credit terms; this too is forbidden, as its purpose and likely effect is to force the net price to the buyer above the competitive level. See, e.g., *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648–49, 100 S.Ct. 1925, 1928–29, 64 L.Ed.2d 580 (1980) (per curiam); *National Electrical Contractors Ass'n, Inc. v. National Constructors Ass'n*, 678 F.2d 492, 501 (4th Cir.1982); *United States v.*

*American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 185–86 (3d Cir.1970). Sometimes competitors agree to use methods of pricing that do not eliminate price competition but make that competition less profitable and hence less likely—for example, by agreeing that each seller will adhere to his previously announced prices. Such an agreement does not put a floor under prices but it does prevent a seller from offering secret discounts. A secret discount enables a seller to expand his output, and his profits, by selling at a shade below the cartel price without provoking an immediate reaction from his competitors. The effort of cartel members to "cheat" their fellows in this fashion will, by increasing the output of the product, eventually make the cartel (or conspiracy, or oligopoly) price untenable. See Stigler, The Organization of Industry 42 (1968). So an agreement not to "cheat" in this way is forbidden too. See *Sugar Institute, Inc. v. United States*, 297 U.S. 553, 582–83, 601–02, 56 S.Ct. 629, 635, 643, 80 L.Ed. 859 (1936).

 There are two exceptions to the principle that the only horizontal price "tampering" that is illegal per se is the type calculated to raise the market price above the competitive level. First, buyer cartels, the object of which is to force the prices that suppliers charge the members of the cartel below the competitive level, are illegal per se. See, e.g., *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 223–24, 68 S.Ct. 996, 999–1000, 92 L.Ed. 1328 (1948). Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint. See Stigler, The Theory of Price 205–06 (3d ed. 1966). Second, in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Supreme Court, by a 4 to 3 vote, held recently that an agreement among doctors to limit the fees they charged for services performed for insured patients was illegal per se, in part because

the agreement might be "a masquerade for an agreement to fix uniform prices, or it may in the future take on that character." *Id.* at 348, 102 S.Ct. at 2475.

Were it not for *Maricopa*, it would be clear that the Society's prohibition of fixed-percentage appraisals was not illegal per se, as the prohibition seems unrelated or at most very tenuously related to any purpose or probable consequence of raising the price of appraisals. Members of the Society are free despite the prohibition to charge as much or as little as they like. Of course one pricing option is taken away from them, and if it were an option that promoted price competition, its prohibition would be highly suspect. But there is no indication it is. While it is true that, if rigidly adhered to, fixed-percentage fees will yield tiny charges for appraising items of slight value, Vogel's method does not work that way. He charges a minimum fee of $10, which means that he charges one percent only for appraisals of $1,000 or more and charges progressively higher percentages as the value of the item appraised falls off from there (for example, 10 percent for an item worth $100).

The apparent tendency of the pricing system that the Society has outlawed is to raise, not lower, the absolute level of appraisal fees, especially for expensive items. For the system gives the appraiser a stake in the value appraised and therefore makes him likely to err on the high side in estimating that value. It conduces not only to high prices but to high prices unrelated to the costs of the appraiser's work, even when there is no fraud in the appraisal. Although there doubtless is some positive correlation between the value of an item and the amount of time the appraiser puts in on appraising it, a 10-carat diamond worth 100 times as much as a one-carat diamond is not, on that account alone, likely to require or receive 100 times the amount of attention from the appraiser. Fixed-percentage appraisal fees seem more closely geared to differences in the wealth of customers than to differences in appraisers' time costs or skills—seem in fact to be a method of price discrimination, which is normally anticompetitive. (Not always, though, as we saw in discussing secret discounts from a cartel price, which are discriminatory since they are selective rather than across the board, normally being offered to the biggest customers only. See Stigler, The Organization of Industry, *supra*, at 43–44, 60.)

Of course, if there is vigorous competition among appraisers, it will limit both the percentage charged and the amount of the appraisal, and may even prevent Vogel from adhering to his fixed-percentage method. But his suit is based on the assumption that competition has not had this effect, so maybe there isn't much competition in gem appraising—we just don't know. Competition to one side, sometimes a customer will want and be quite content to pay for a high appraisal—if for example he is trying to sell the item being appraised. But the challenged bylaw does not limit the fee or the appraisal; it merely outlaws a method of fee setting that seems to invite the appraiser to practice a fraud on his customer, by first announcing that his fee is a fixed percentage and then over-appraising the item; or, at the very least, that invites discrimination against wealthier, or less sophisticated, customers. Another strike against the fixed-percentage fee system is that (according to a letter attached to one of Vogel's briefs in the district court) the one percent fee that Vogel charges is (or was) the industry norm; so by abolishing the system the Society may, for whatever reason, have been breaking up a collusive arrangement.

■ Ethical concerns have often, and unavailingly, been offered as reasons for limiting price competition. See, e.g., *National Society of Professional Engineers v. United States*, 435 U.S. 679, 693–96, 98 S.Ct. 1355, 1366–67, 55 L.Ed.2d 637 (1978); but cf. *United States v. United States Gypsum Co., supra*, 438 U.S. at 448, 98 S.Ct. at 2879, citing *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 603–04, 45 S.Ct. 586, 591, 69 L.Ed. 1104 (1925). But there is no suggestion that the

Society's aversion to fixed-percentage appraisal fees actually covers an aversion to price competition; nor, as we have said, is it apparent how such fees promote price competition. Moreover, there is no evidence that the Society has any power in the market for appraising gems, or any other market, and an absence of market power is a reason against inferring that a business practice is monopolistic.

The challenged bylaw is more likely a praiseworthy effort at self-regulation than a device for facilitating supracompetitive pricing. This is not to say that the Society's members are altruists. Presumably they are profit-maximizers. They may merely think that a practice likely to bring the appraisal business into disrepute will depress profits in the long run. They may even be concerned with potential antitrust liability from adhering to a one percent fee system—a type of "ethical" concern to which antitrust law ought to give some weight.

The strongest objection to banning fixed-percentage fees is that by putting pricing on the Society's agenda the ban could foster price fixing. The letter mentioned earlier indicates that when the Society outlawed the fixed-percentage fee its members had "difficulty in abiding by" the new rule, prompting the Society's vice-president (whose last name, Gadd, has powerful associations for students of antitrust law, see *American Column & Lumber Co. v. United States*, 257 U.S. 377, 401–02, 42 S.Ct. 114, 117–18, 66 L.Ed. 284 (1921)) to suggest an illustrative fee schedule complete with specific fees (one, for example, being $750 to appraise items worth between $40,000 and $100,000) arrayed much as in a percentage-fee schedule. If in the trial on the merits Vogel can show that abolishing fixed-percentage fees encouraged the members of the Society to adopt a collusive fee schedule as a substitute, he will be well on his way to proving a violation of the statute. But the danger that abolishing an anticompetitive fee system will lead to adoption of an equally or more anticompetitive one in its place is (on this record at

least) too speculative to bring the per se rule into play.

The Supreme Court has told us that before we leap to the conclusion that an agreement among competitors is price fixing we should take a quick look to see whether it has clear anticompetitive consequences and lacks any redeeming competitive virtues. See *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979); see also *National Collegiate Athletic Ass'n v. Board of Regents*, — U.S. —, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984). Having done so we conclude that there is insufficient basis in the present record for characterizing the Society's prohibition of fixed-percentage appraisal fees as price fixing. Two additional considerations confirm us in this conclusion. First, contrary to our earlier assumption, Vogel has not quite shown that the agreement of which he is complaining is an agreement among competitors, as most of the members of the American Society of Appraisers are not gem appraisers, and of the few who are only four have their places of business in Illinois. We do not know how many of these are in Chicago, where Vogel has his place of business, and we do not know the radius within which Vogel competes for customers. Maybe the bylaw affects competition among other appraisers belonging to the Society, and maybe Vogel would have standing to complain about it even if competition in the market in which he operates were not affected by it. But his failure to make a clear-cut showing that the bylaw is an agreement among competitors weakens his case. Second, the novelty of the challenged practice (novel to the courts, that is) is a reason against per se classification. See *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963); but see *Arizona v. Maricopa County Medical Society, supra*, 457 U.S. at 349–51, 102 S.Ct. at 2475–76. The attempt to get rid of the fixed-percentage appraisal fee may be perniciously anticompetitive in ways that we cannot perceive from the scanty record before us, but to

condemn it before any evidence on its competitive effects has been produced would prevent the courts from acquiring any information about it. It is difficult enough for judges to inform themselves about business practices without shutting off the information flow before it begins, by prematurely adopting a rule of blanket illegality.

All this leaves out of account, however, the possibility that the *Maricopa* decision signals an expansion of the traditional per se rule against price fixing beyond agreements likely to reduce competition. Commentators have wondered how an agreement by sellers to limit the amount they will charge their customers—the agreement in *Maricopa*—can reduce competition. See Easterbrook, *Maximum Price Fixing*, 48 U.Chi.L.Rev. 886 (1981); Harrison, *Price Fixing, the Professions, and Ancillary Restraints: Coping with Maricopa County*, 1982 U.Ill.L.Rev. 925, 936–44; Liebeler, *1983 Economic Review of Antitrust Developments: The Distinction Between Price and Nonprice Distribution Restrictions*, 31 UCLA L.Rev. 384, 397–98 (1983). But the price ceiling in *Maricopa* may have been intended as a target or even a floor—a concern heightened by the fact that 85 to 95 percent of the county's doctors were charging at or above the ceiling. See 457 U.S. at 341 n. 10, 102 S.Ct. at 2471 n. 10. A group of sellers is unlikely to fix a maximum price that will not return them a comfortable profit; and having done so they may be disinclined to charge a lower price even if it would cover their costs plus a reasonable profit, if not as comfortable a one. Furthermore, sellers who exchange the kind of price and cost information that is necessary to fix a ceiling may find they have done all that is necessary to fix a floor as well; that is, the *process* of agreeing on the ceiling may foster supracompetitive pricing, whether tacit or explicit. Maybe therefore *Maricopa* is to be explained as a case where a cartel-facilitating practice, analogous to banning secret price cutting, was condemned. In any event, it is distinguishable from this case.

■ Now Vogel may be able to prove at trial that the bylaw is an unreasonable restraint of trade and is therefore unlawful under section 1 even though not illegal per se. But this will require him to establish a relevant market (by adding up the sales of all the gem appraisers to whom customers in the various areas served by the Society's gem-appraiser members could turn if those members charged supracompetitive prices for appraising, see *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 331, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961)); to show that the Society's members as a group have a substantial share of that market; and to prove that the anticompetitive effects of the bylaw in that market exceed any procompetitive effects that the Society may be able to point to. See *National Collegiate Athletic Ass'n v. Board of Regents, supra*, 104 S.Ct. at 2961–62; *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 268–69 (7th Cir.1981); *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560, 1569, 1571, 1573 (11th Cir.1983). Vogel may be able at trial to show all this—or to show that the bylaw really is so dangerous that it should be deemed illegal per se. We do not mean to prejudge the trial. But as he has shown none of these things as yet, we have no basis for thinking him likely to succeed in doing so at trial.

AFFIRMED.