### INTERNATIONAL TEST AND BALANCE, INC., Plaintiff,

v.

### ASSOCIATED AIR AND BALANCE COUNCIL, and Certain Members Thereof, Whose Identities Presently are Unknown, Defendants.

No. 98 C 2553.

United States District Court,
N.D. Illinois,
Eastern Division.

July 15, 1998.

Richard P. Reichstein, Law Offices of Richard P. Reichstein, Chicago, IL, for plaintiff.

John Marc Peterson, Samuel John Erkonen, Jonathan T. Howe, Terrence Hutton, Howe & Hutton, Ltd., Chicago, IL, James E. Anderson, Howe Anderson & Steyer, PC, Washington, DC, for defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is Plaintiff's Motion for a Preliminary Injunction (Doc. No. 5). For the following reasons, Plaintiff's Motion is denied.

### I. BACKGROUND

On March 27, 1998, International Test and Balance, Inc. ("International"), an Illinois corporation, filed a three-count complaint against its former trade association, Associated Air Balance Council ("AABC"), and certain unknown members of AABC, in the Circuit Court of Cook County, Illinois. Counts I and II allege conspiracy in restraint of trade and an unlawful monopoly, respectively, in violation of Section 10/3 of the Illinois Antitrust Act. *See* 740 ILCS 10/3. Count III alleges common law intentional interference with contract.

On April 27, 1998, AABC, a California corporation with its principal place of business in Washington, D.C., removed the case to federal court, claiming diversity of citizenship.[1] International has since amend-

---

**1.** Because "federal courts are courts of limited jurisdiction," *Matter of Application of County Collector*, 96 F.3d 890, 895 (7th Cir.1996), the court has a "nondelegable duty to police the limits of federal jurisdiction with meticulous care." *Market Street Assocs. Ltd. v. Frey*, 941 F.2d 588, 590 (7th Cir.1991); *see also Krueger v. Cartwright*, 996 F.2d 928, 930 (7th Cir.1993); Fed.R.Civ.P. 12(h)(3). It does not escape the court's attention that there are jurisdictional issues in this case. First, because International's complaint includes allegations against "unknown members" of AABC, the citizenship of those members is unknown. Nonetheless, "naming a John Doe defendant will not defeat the named

defendants' right to remove a diversity case if their citizenship is diverse from that of the plaintiffs." *Howell v. Tribune Entertain. Co.*, 106 F.3d 215, 218 (7th Cir.1997); *see also Salzstein v. Bekins Van Lines, Inc.*, 747 F.Supp. 1281, 1283 n. 4 (N.D.Ill.1990). The named party here, AABC, is, standing alone, of diverse citizenship. However, certain membership organizations "take the citizenship of each member." *Indiana Gas Co., Inc. v. Home Ins. Co.*, 141 F.3d 314, 316 (7th Cir.1998); *Nat'l Assoc. of Realtors v. Nat'l Real Estate Assoc.*, 894 F.2d 937, 940 (7th Cir. 1990) (citizenship of incorporated trade association was that of its members because the members were the real parties in interest); *National*

ed its complaint to include a claim of "wrongful expulsion," and now moves for a preliminary injunction that would reinstate its membership in AABC pending a full-trial on the merits. At trial, International would seek a permanent injunction that would prevent AABC from unlawfully excluding International from membership in AABC. The relevant facts follow.

International provides testing and balancing services of heat, vent and air conditioning ("HVAC") equipment to mechanical contractors and others in the construction industry. Testing and balancing is the process of measuring, regulating and adjusting the HVAC system of a building to insure that it complies with performance specifications. In the course of balancing, International utilizes instruments to take readings of the air and water flow through the HVAC system. International also notes the settings of the mechanical devices, makes necessary adjustments and recommendations, and documents its findings in a balancing report to the client.

Up until its expulsion on May 1, 1998, International was a member of AABC. AABC is a non-profit trade association composed of 85 independent firms that provide testing and balancing services of HVAC systems throughout the United States. Membership in the AABC is allegedly desirable because firms must meet certain requirements evidencing competence, and because it enables firms to issue a "National Project Certification Performance Guaranty" ("Guaranty"). Issuance of the Guaranty indicates that the HVAC equipment installed during a project meets engineering expectations and is balanced in accordance with accepted trade practice and the AABC National Standards.

Additionally, the Guaranty enables a party who uses the services of a AABC member, e.g., a contractor or engineer, to file a complaint with AABC if the services performed by the member fail to meet quality specifications, are inadequate, or otherwise insufficient. AABC then initiates an investigation into the allegations of the complaint and agrees to supervise any remaining work. That turn of events is what happened here, and is what led to the eventual expulsion of International from AABC.

In 1995, International entered into a contract with Western Sheet Metal, Inc. ("Western") to provide test and balancing services at the Copper Hills School Project ("Project") for the Jordan School District in Salt Lake City, Utah. In early 1997, Olsen & Peterson ("O & P"), a mechanical engineering consulting firm working on the Project, filed two successive complaints with AABC regarding International's performance.[2] In the first complaint, dated March 25, 1997, O & P wrote a letter to AABC's executive director, Kenneth Sufka ("Sufka"), alleging that International was failing to complete its work on the Project. (See Def.'s Mem. in Opp'n, Ex. 3.) The letter also strongly expressed O & P's dissatisfaction with International and questioned how International qualified for membership in the AABC. In accordance with AABC's policies and procedures, Sufka notified International of O & P's complaint and provided International 14 days to respond. (See id., Ex. 4.) In a letter to Sufka dated April 14, 1997, International denied O & P's allegations and cited the ina-

Assoc. of Realtors v. National Real Estate Assoc., Inc., 699 F.Supp. 678, 679 n. 3 (N.D.Ill.1988). On the other hand, "for purposes of diversity jurisdiction[,] a corporation is a corporation." Cote v. Wadel, 796 F.2d 981, 983 (7th Cir.1986). If AABC assumes the citizenship of its members, then jurisdiction may be absent because AABC has admitted in its later pleadings that it has one member in Illinois (citizenship unknown) (see Def.'s Mem. in Opp'n at 7.), the state where International is a citizen. With an abundance of caution, the court proceeds under Cote, and concludes that diversity jurisdiction exists because the citizenship of International is diverse from the citizenship of AABC. See Nat'l Assoc. of Realtors, 894 F.2d at 939–40 (conclud-

ing that for diversity purposes, the inquiry into the relevant citizenship of an incorporated trade association depends upon whether the members or the association are the real parties in interest).

2. In at least one part of the record, there is a reference to an additional complaint filed against International prior to the complaints filed in early 1997. (See Def.'s Mem. in Opp'n at Ex. 4.). That complaint, lodged by Western in October 1996, accused International of failing to complete its work. Because neither party provides further elaboration on that complaint, the court will not deem it relevant for purposes of this discussion.

bility of the mechanical contractor on the project to complete its own work as the reason for the subsequent delay in performance by International. (*See id.,* Ex. 5.)

On April 22, 1997, O & P sent a second letter of complaint to AABC. (*See id.,* Ex. 6.) In that letter, O & P alleged that a report issued by International in April 1996 was "totally unacceptable" and "in substantial noncompliance with the contract documents." (*Id.*) Sufka in turn notified International of the second complaint and directed International to send AABC a copy of the final balancing report and a copy of the drawings for the Project. (*See id.,* Ex. 7.) On May 22, 1997, International sent the relevant documents to AABC. (*See id.,* Ex. 8.) AABC then initiated an investigation into the complaints against International.

On May 30, 1997, AABC held a meeting in Salt Lake City to address O & P's complaints against International. A vice-president of AABC, Robert Conboy ("Conboy"), along with representatives of International, O & P, and other contractors on the Project, attended. After reviewing the allegations against International, the attendees (except those from O & P) conducted a walk-through at the site of the Project. Upon completion of the walk-through, it was agreed that 18 of the 25 deficiencies that International had previously claimed as stumbling blocks were no longer at issue. For the remaining seven deficiencies, however, the parties agreed to coordinate their efforts to allow prompt completion. (*See id.,* Exs. 9, 10.)

In early August 1997, Conboy and another AABC vice-president, Mike Young ("Young"), visited the site of the Project in connection with the ongoing investigation of International's performance. The purpose of the visit was to determine the accuracy of International's most-recent report on the Project. Upon completion of the visit, Conboy issued a report criticizing the accuracy of International's report and expressing doubt on the latest deficiencies that International claimed was preventing it from completing its work. (*See id.,* Exs. 11, 12.)

Based on the findings and conclusions in Conboy's report, the AABC Board of Directors concluded that International had failed to comply with AABC policies and standards, a condition of membership. Accordingly, on November 5, 1997, the Board voted to place International on probation. (*See id.,* Exs. 20, 27.) International then petitioned AABC to reconsider its decision. (*See id.,* Ex. 15.)

While International's appeal was pending, O & P and other contractors visited the site of the Project to verify the results of International's latest report. O & P determined that the air system on the Project was still not properly balanced. O & P advised International of its conclusion and stated that the Jordan School District did not want International to return to the site. O & P later persuaded the school district to allow International to return and complete its work. (*See id.,* Exs. 16–18.)

On February 13, 1998, the Board issued a written opinion detailing the results of its investigation and rejecting International's appeal. (*See id.,* Ex. 20.) The Board also took issue with International's challenge of the investigation results. Most notably, the Board emphasized that it was International personnel, rather than AABC representatives, who performed the investigation's test readings that indicated prior inaccuracies. "AABC representatives merely observed the procedure and compared the information obtained with the information contained in [International's] report." (*Id.* at p. 5.) Finally, the Board outlined the conditions of International's probation:

1) That International be placed on probation for a period of two years, beginning on January 31, 1998;

2) That International comply with the terms and conditions of the probation as described in the AABC Policies and Procedures;

3) That International pay the costs ($4,728) for the AABC investigation of the Project as required by the AABC Policies and Procedures on or before March 1, 1998;

4) That International provide a written statement concerning its views on AABC independence, the National Performance Guaranty, and the AABC Policies and Procedures no later than March 1, 1998;

5) That International return to the Project to complete the balancing in accordance with AABC standards.

(*Id.* at p. 6.)

The terms of the probation also meant that, pursuant to the Guaranty, International became subject to the supervision of AABC for its remaining work on the Project. (*See id.,* Ex. 21) The Board assigned AABC's Executive Vice–President, Rick Cox ("Cox"), and another AABC representative, Herb Crask ("Crask"), to supervise International's completion of the Project. (*See id.,* Exs. 22, 23.) In addition to his position as Executive Vice–President of AABC, Cox was employed by one of AABC's members, Technical Air Balance, Inc. ("Technical").

At a March 2, 1998, meeting of all relevant contractors on the Project, Cox iterated AABC's supervisory role, and later performed an on-site inspection with the group. Once on-site, Cox and Crask determined that nothing was preventing International from completing its balancing of the system. Gary Tarazzi ("Tarazzi"), International's President, immediately disputed that conclusion, and claimed that International had already balanced the system. As such, Tarazzi hinted that International would not be willing to complete the job. Cox then ended the meeting and stated that he would send his findings to the Board. Before leaving, however, Cox provided representatives of two contractors on the Project with the business card of Technical. (*See id.*)

In a letter dated March 25, 1998, the Board informed International of its intent to expel the company from its membership. (*See id.,* Ex. 27.) The Board cited International's failure to complete its duties on the Project and its failure to comply with most, if not all, the conditions of probation. The Board invited International to present reasons against expulsion at its next meeting scheduled for April 17, 1998.

On April 17, 1998, Tarazzi appeared before the Board and asserted International's position. Finding those reasons unacceptable, the Board expelled International. As grounds for expulsion, the Board cited International's alleged inadequate performance on the Project and International's failure to comply with the terms of its probation. The Board also noted that the school district had ordered International off the site of the Project. Consequently, AABC assumed responsibility for the completion of the Project. (*See id.*)

According to International, its expulsion ran afoul of the Illinois Antitrust Act. *See* 740 ILCS 10/3. International alleges that "Unnamed Defendants and AABC, acting in concert, combined, contracted, and conspired horizontally to exclude [International] from the relevant service and geographic markets...." (Compl. at ¶ 26.) International seeks reinstatement in AABC, arguing that its expulsion constitutes an unlawful restraint of trade because "[m]embership in the AABC is a highly advantageous, and in some instances, a necessary credential in the marketplace for test & balance services." (Pl.'s Mem. in Supp. at 1.) Furthermore, International avers, "[r]emoval of [International] from the AABC group will significantly reduce competition...." (*Id.* at 2.)

## II. DISCUSSION

■ At the outset, the court notes that neither party addresses whether AABC is exempt from liability under the Illinois Antitrust Act. The Illinois Antitrust Act "was intended to apply only to conduct relating to for-profit enterprises." *O'Regan v. Arbitration Forums, Inc.,* 121 F.3d 1060, 1065 (7th Cir.1997) (*citing* 740 ILCS 10/2). Although this appears to be a crucial, and perhaps dispositive issue, " 'it is not the role of [the] court to research and construct the legal arguments open to parties, especially when they are represented by counsel.' " *Doherty v. City of Chicago,* 75 F.3d 318, 324 (7th Cir.1996) (*quoting Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986)). Therefore, the court will leave that issue for another day and address the merits of International's motion for a preliminary injunction.

■ "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Boucher v. School Bd. of Greenfield,* 134 F.3d 821, 823 (7th Cir.1998) (citations and internal quotation marks omitted.). In order to prevail on a motion for a prelimi-

nary injunction, the movant must demonstrate (1) some likelihood, *i.e.*, a better than negligible chance, of success on the merits, see *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114–15 (7th Cir.1997) and (2) " 'an inadequate remedy at law and irreparable harm if preliminary relief is denied.' " *Brownsburg, Area Patrons Affecting Change v. Baldwin*, 137 F.3d 503, 507 (7th Cir.1998) (*quoting TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir.1997)); *see also Wisconsin Music Network, Inc. v. Muzak Limited Partnership*, 5 F.3d 218, 221 (7th Cir. 1993). If the court finds either of these facts absent, then the court's analysis "ends and the preliminary injunction should not be issued." *Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir.1998); *see also Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d at 12 (7th Cir.1992); *Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 307 (7th Cir.1992). On the other hand, if the movant demonstrates these elements, "then the court considers the irreparable harm to the [nonmovant] if preliminary relief is granted as balanced against the irreparable harm to [the movant] if preliminary relief is denied, and the public interests involved." *Baldwin*, 137 F.3d at 507 (citations omitted.); *see also Boucher*, 134 F.3d at 824. The court uses a sliding "scale approach" to this balancing test; that is, "the more likely it is that [the movant] will succeed on the merits, the less the balance of the irreparable harms need weigh toward its side. . . ." *Abbott Lab.*, 971 F.2d at 12; *cf. General Leaseways, Inc. v. Nat'l. Truck Leasing Assoc.*, 744 F.2d 588, 590–91 (7th Cir.1984).

Before addressing the necessary elements for a preliminary injunction to issue, the court notes that International's memorandum of law is inadequate. Rather than focus on those elements, International engages in a discussion of three leading antitrust cases that it argues control here: (1) *Radiant Burners, Inc. v. Peoples Gas Light and Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); (2) *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938 (2d Cir.1987) [3]; (3) *American Society of Mech. Engineers,*

*Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). While those cases may be relevant, International only belatedly addresses the prerequisites for a preliminary injunction. Even then, however, International's discussion is sparse, consisting of about one page. This lack of analysis certainly detracts from International's attempt to meet its burden and obtain this extraordinary remedy.

■ In its opening memorandum, International argues that it is likely to succeed on the merits because:

> [E]jection of this company flies in the face of thousands of successful jobs, all tested & balanced to the complete satisfaction of owners, engineers and building contractors across America. The test & balance personnel employed by [International] were and are among the finest in the land. [International] was and is in full compliance with the AABC rules and regulations. Expulsion of this proud and hard working company was merely part of a plan fomented by certain directors of AABC, to manipulate the marketplace and reduce competition among the remaining AABC companies. . . . [International] will plead and prove that Messrs. Cox, Sufka and other unknown confederates conspired to reduce competition within AABC and the test and balance industry.

(Pl.'s Mem. in Supp. at 10–11.) Accordingly, International rests on its alleged ability to prevail on Count I of its complaint, *i.e.*, to show that its expulsion was an unlawful restraint of trade in violation of the Illinois Antitrust Act, 720 ILCS 10/3. International does not submit any arguments with respect to Counts II through IV. *Cf. Doe, By and Through G.S. v. Johnson*, 52 F.3d 1448, 1457 (7th Cir.1995) (stating that "a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point.").

■ Before delving into the merits of International's antitrust claim, a point of clarification is necessary. International chose to

---

**3.** In *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), the Supreme Court affirmed the Second Circuit's decision. International fails to cite the Supreme Court's decision and instead limits its discussion to the Second Circuit's opinion.

bring its suit under the antitrust laws of the state of Illinois, rather than under federal law. Nonetheless, "Illinois law provides that its courts should use the construction of federal antitrust law by federal courts as a guide in the interpretation of statutes that are substantially similar to federal antitrust law." *Sportmart, Inc. v. No Fear, Inc.*, 94 C 4890, 1996 WL 296643, at * 17 (N.D.Ill. June 3, 1996) (*citing State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1479–80 (7th Cir.1991)); *see also* 740 ILCS 10/11 (1997) ("When the wording of [the Illinois Antitrust Act] is identical or similar to that of federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide...."); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 162 Ill.2d 99, 204 Ill. Dec. 769, 642 N.E.2d 470, 472 (1994) (noting this principle, but also emphasizing that "[t]he Federal decisions are not binding on [Illinois courts]."); *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188 (7th Cir.1985); *Collins v. Assoc. Pathologists, Ltd.*, 676 F.Supp. 1388, 1407 (C.D.Ill.1987).

Here, the Illinois Antitrust Act's prohibition of conspiracies in restraint of trade, 740 ILCS 10/3(1) & (2), was intentionally based on Section 1 of the Sherman Act, 15 U.S.C. § 1. *See Laughlin v. Evanston Hosp.*, 133 Ill.2d 374, 140 Ill.Dec. 861, 550 N.E.2d 986, 991 (1990); *People ex rel. Scott v. College Hills Corp.*, 91 Ill.2d 138, 61 Ill.Dec. 766, 435 N.E.2d 463, 469–71 (1982); *Blake v. H–F Group Multiple Listing Service*, 36 Ill. App.3d 730, 345 N.E.2d 18, 24 (1976). Section 10/3 of the Illinois Antitrust Act provides, in relevant part:

> Every person shall be deemed to have committed a violation of this Act who shall: (1) Make any contract with, or engage in any combination or conspiracy with, any person who is, or but for a prior arrangement would be, a competitor of such person: (a) [to price fix]; (b) [to manipulate supplies, sales or production for the purposes of price fixing];
>
> (c) allocating or dividing customers territories, supplies, sales, or markets, functional, or geographical, for any commodity or service; or

> (2) By contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce....

740 ILCS 10/3 (1998).

Similarly, albeit less verbose, § 1 of the Sherman Act forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the states." 15 U.S.C. § 1. Although the terms of § 1 of the Sherman Act "prohibit every agreement in 'restraint of trade,' [the Supreme Court] has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, —— U.S. ——, ——, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (citations omitted).

One significant difference between the Illinois Antitrust Act and § 1 of the Sherman Act is that the Illinois statute codifies what restraints are illegal "per se," 740 ILCS 10/3(1)(a)–(c), versus restraints that should be analyzed under the "Rule of Reason," 740 ILCS 10/3(2). *See Sportmart, Inc.*, 1996 WL 296643, at * 17 (*citing* 740 ILCS 10/3 Bar Committee Comments—1967 (1993)); *Blake*, 345 N.E.2d at 25–26; *see generally Ethan Allen, Inc.*, 204 Ill.Dec. 769, 642 N.E.2d at 472 (noting the differences between '§ 10/3(3) of the Illinois Antitrust Act and Section 2 of the Sherman Act). Under § 1 of the Sherman Act, by contrast, courts determine, "based on the nature of the restraint," whether a per se violation exists or whether the "Rule of Reason" should apply. *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993).

 In cases involving § 1 of the Sherman Act, courts "apply the per se rule when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *General Leaseways, Inc. v. Nat'l. Truck Leasing Assoc.*, 744 F.2d 588, 595 (7th Cir. 1984) (*quoting Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)). "Restraints that are per se unreasonable include agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry or restraint is needed to establish their illegality." *Wilk v. American Medical Association*, 895

F.2d 352, 358 (7th Cir.1990) (*citing Nat'l Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). Examples of per se rule offenses under § 1 of the Sherman Act include: (1) horizontal price fixing conspiracies, see *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 348, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); (2) certain attempts at market allocation, see *Blackburn v. Sweeney,* 53 F.3d 825, 827 (7th Cir.1995) and *General Leaseways,* 744 F.2d at 595; and (3) group boycotts, "if used to enforce a rule or policy or practice that is itself illegal per se [*e.g.,* illegal price-fixing]", *Vogel v. American Society of Appraisers,* 744 F.2d 598, 600 (7th Cir.1984). The Supreme Court recently reiterated its disfavor of applying the per se rule to " 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.' " *Khan,* —— U.S. at ——, 118 S.Ct. at 279 (*quoting FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)).

■ Because of the limited instances where the per se rule is applied, most antitrust claims under Section 1 of the Sherman Act are subject to the Rule of Reason. *See Khan,* —— U.S. at ——, 118 S.Ct. at 279; *see also Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Assoc., Inc.,* 672 F.2d 1280, 1284 (7th Cir.1982). "[T]he rule of reason category includes agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business involved, the particular restraints history, and the reasons it was imposed." *Wilk,* 895 F.2d at 358 (*citing Nat'l Society of Professional Engineers,* 435 U.S. at 692, 98 S.Ct. 1355); *see also Khan,* —— U.S. at ——, 118 S.Ct. at 279; *Wisc. Music Network, Inc. v. Muzak Limited Partnership,* 5 F.3d 218, 222 (7th Cir.1993). "The test of legality under the rule of reason is whether the challenged conduct promotes or suppresses competition." *Id.*

In this case, International alleges that its expulsion was "unlawful per se as restraints of trade by means of horizontal market allocation or division, all within the meaning of

740 ILCS 10/3." (Compl. at ¶ 28.) Alternatively, International alleges that its expulsion "unreasonably restrain[s] trade, by means of horizontal market allocation or division, all within the meaning of 740 ILCS 10/3." (Id. at ¶ 29.) In other words, International's alternative claim seeks to invoke the Rule of Reason if the per se rule does not apply. In light of the facts supporting International's allegations, the court finds that the Rule of Reason should apply, but not based on the theory that International espouses.

■ Market allocation is indeed per se illegal under the Illinois Antitrust Act. *See* 740 ILCS 10/3(1)(c). The facts that International presents here, however, do not suggest market allocation. *Cf. Blake,* 345 N.E.2d at 27–28. Rather, a trade association's decision to expel one of its members is more properly described as a "concerted refusal to deal" or "group boycott." *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 290, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Under the Illinois Antitrust Act, that conduct is subject to the Rule of Reason. ·*See* 740 ILCS 10/3 Bar Committee Comments—1967 [4]; *see also Blake,* 345 N.E.2d at 27–28 (noting that those agreements not specifically listed under § 10/3(1), including concerted refusals to deal, are subject to the rule of reason).

In general, courts addressing facts similar to those at bar under § 1 of the Sherman Act share this view. *See Northwest Wholesale,* 472 U.S. 284, 105 S.Ct. 2613; *see also Phil Tolkan Datsun, Inc.,* 672 F.2d at 1285 ("[M]embership arrangements in trade associations form an exception to the general rule that group boycotts constitute per se antitrust violations."); *United States Trotting Assoc. v. Chicago Downs Assoc., Inc.,* 665 F.2d 781, 789–90 (7th Cir.1981); *Martin v. American Kennel Club,* 697 F.Supp. 997, 1000 (N.D.Ill.1988); *Carleton v. Vermont Dairy Herd Improv. Assoc.,* 782 F.Supp. 926, 932–33 (D.Vt. 1991). Notably, none of International's arguments attempt in any way to show market allocation. For these reasons, the court will apply the Rule of Reason in

---

**4.** "Illinois courts have endorsed the Bar Committee's interpretation of the [Illinois Antitrust Act]." *Sportmart,* 1996 WL 296643, at * 17 (*citing Eth-* *an Allen, Inc.,* 204 Ill.Dec. 769, 642 N.E.2d at 474).

determining whether International has a "better than negligible" chance of showing that its expulsion was an unreasonable restraint of trade.

■ "The Illinois Supreme Court has indicated that the rule of reason should be applied similarly under Illinois law, as it is under the Sherman Act." *Sportmart,* 1996 WL 296643, at * 18 (*citing College Hills Corp.,* 61 Ill.Dec. 766, 435 N.E.2d at 471–72). "The threshold issue in any rule of reason case is market power." *Wilk,* 895 F.2d at 359. Without proof of market power to restrain competition substantially, "any case under the Rule of Reason collapses...." *L.A.P.D., Inc. v. General Elect. Corp.,* 132 F.3d 402, 405 (7th Cir.1997); *see also Ehredt Underground, Inc. v. Comm. Edison Co.,* 90 F.3d 238, 239 (7th Cir.1996). Market power "entails cutting back output in the market and thus driving up prices to consumers." *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994). Market power can be evident where the defendant has "unique access to a business element necessary for effective competition." *Northwest Wholesale Stationers, Inc.,* 472 U.S. at 298, 105 S.Ct. 2613.

In this case, International has not shown that AABC membership allows the exercise of market power or that it provides exclusive access to a necessary business element. *See Vogel,* 744 F.2d at 604 (To succeed at trial, plaintiff would have to show that association's "members as a group have a substantial share of the market...."). While International claims that membership is "highly advantageous," it concedes that membership is necessary only "in some instances." (Pl.'s Mem. in Supp. at 1.) Even those allegations are devoid of any support in the record, however. In fact, AABC points out that there are approximately 500 independent testing and balancing firms in the United States; only 85 of these firms are members of AABC. Furthermore, while there are approximately 12 independent testing and balance firms in the Chicago area, only one is a member of AABC. International did not even attempt to define the relevant market. *See Vogel,* 744 F.2d at 604 (stating that a plaintiff must establish the relevant market to prevail under § 1 of the Sherman Act). Therefore, with no indication to the contrary, it is clear

that a testing and balancing firm can effectively compete without being a member of AABC. Put another way, the exclusion of International from AABC will not cause a decrease in output of testing and balancing services. *See Sanjuan,* 40 F.3d at 251 (association's refusal to certify plaintiffs did not "remove their output from the market and therefore [did] not raise prices to consumers."); *see also In re Circuit Breaker Litigation,* 984 F.Supp. 1267, 1281 (C.D.Cal.1997) (refusal of certification had no effect on the market).

The court also finds that the three cases that International cites in support of its motion (*Radiant Burners; Indian Head;* and *Hydrolevel*) are distinguishable to the case at bar. In general, these cases address the potential of a standard-making organization to abuse its power where "it is used to exclude competitors from a market by denying them the needed stamp of approval." *See ECOS Electronics Corp. v. Underwriters Laboratories,* 743 F.2d 498, 502 (7th Cir. 1984) (discussing *Radiant Burners* and *Hydrolevel*). International argues that membership in AABC and the accompanying Guaranty are comparable necessities in the testing and balancing industry. The current record, however, does not support that conclusion. Nevertheless, the court will examine each of the cases that International cites in turn.

### 1. *Radiant Burners*

In *Radiant Burners,* the American Gas Association ("AGA"), a standard-making organization within the gas industry, twice refused to provide its "seal of approval" on plaintiff's gas burners. 364 U.S. at 658, 81 S.Ct. 365. Because the plaintiff's gas burners did not receive the AGA's seal of approval, gas utilities refused to supply gas for use in the plaintiff's gas burners. *See id.* The gas burners were therefore unmarketable. *See id.* The plaintiff filed suit against the AGA and the gas utilities, alleging that their refusal to supply gas based on the absence of AGA approval was an unlawful restraint of trade under § 1 of the Sherman Act. *See id.* at 658–59, 81 S.Ct. 365. The plaintiff also alleged that the AGA's approval process was

unduly influenced by its gas utility members because some of them were in competition with the plaintiff. *See id.* Reversing a lower court's dismissal of the complaint, the Supreme Court held that such allegations state a claim under § 1 of the Sherman Act because "[t]he alleged conspiratorial refusal to provide gas for use in [the plaintiff's gas burners] interferes with the natural flow of interstate commerce and clearly has, by its 'nature' and 'character', a 'monopolistic tendency.'" *Id.* at 660, 81 S.Ct. 365.

International argues that the facts of *Radiant Burners* are analogous to the case at bar because, in the testing and balancing industry, "membership in AABC is desirable and sometimes even a requirement," and because the Guaranty provides "an important advantage over non-members." (Pl.'s Mem. in Supp. at 7.) Furthermore, International claims that its poor evaluations on the Project were actually the result of a conspiracy because competitors sat on AABC's Board and investigated O & P's complaints. (*Id.*) Accordingly, International contends that under *Radiant Burners*, the facts at bar are "sufficient to state a claim for relief under section 1 of the Sherman Act." (Pl.'s Mem. in Supp. at 7–8.)

International's reliance on *Radiant Burners* is misplaced. The Court in *Radiant Burners* simply held that the plaintiff's allegations survived a motion to dismiss. 364 U.S. at 660, 81 S.Ct. 365. Under federal notice pleading standards, a motion to dismiss should not be granted "unless it is impossible [for the plaintiff] to prevail under any set of facts that could be proved consistent with his allegations." *Albiero v. City of Kankakee,* 122 F.3d 417, 419 (7th Cir.1997); the burden is on the defendant to persuade the court that the plaintiff's allegations are wanting. Here, by contrast, the motion before the court is a motion for a preliminary injunction. Therefore, the burden was on International to show that it has "a better than negligible chance" of success on the merits. *See Meridian Mut. Ins. Co.,* 128 F.3d at 1114–15; *see also Boucher,* 134 F.3d at 823. As explained above, International has not done so, to any degree. *Cf. McDaniel v. Appraisal Institute,* 117 F.3d 421, 423 (9th Cir.1997) (emphasizing the difference between a Rule 12(b)(6) motion and a motion

for summary judgment, where "it was incumbent on the plaintiff to present evidence.").

### 2. *Indian Head*

International also relies on the Second Circuit's opinion in *Indian Head,* 817 F.2d 938 (2nd Cir.1987). In that case, Indian Head sued a competitor, Allied Tube & Conduit, Corp. ("Allied") under § 1 of the Sherman Act after Allied unduly prevented Indian Head's product from being approved by the National Fire Protection Association ("NFPA"), the publisher of the industry's model code. 817 F.2d at 939. The model code, which established product standards within the industry, was "the most widely disseminated and adopted model code in the world.... [A] substantial number of state and local governments adopt the [model code] as law in whole or in part." *Id.*

Allied was eligible to vote on whether Indian Head's product would receive model code approval. *See id.* at 940. Prior to the NFPA's annual meeting where the vote would be held, Allied formulated a plan to insure that Indian's product would not receive the required number of votes for approval. *See id.* Implementing campaign tactics that would make some precinct captains blush, Allied

> arranged for 155 persons—including employees, sales agents, the agents' employees, company executives, employees of two of Allied divisions, and the wife of the national sales director—to join the NFPA, to register as voting members, and to attend the annual meeting to vote against [approval of the plaintiff's product]. [The defendant] also paid over $100,000 for the membership, registration, and attendance expenses of these voters.... At the annual meeting, [the defendant] instructed its personnel where to sit, based upon a detailed seating chart, and appointed group leaders to instruct voters how the discussion is progressing and how to vote. Boxed lunches were provided and the voters were told to stay nailed to their seats until the end.... Group leaders used walkie-talkies and hand signals to facilitate communication.

*Id.* at 940–41. Not surprisingly then, the die was cast, and when the vote was taken, Allied's confederates were responsible for the NFPA's refusal to approve Indian Head's product. *See id.*

At trial, the jury entered judgment in favor of Indian Head. *See id.* The trial court, however, granted Allied's motion for a judgment notwithstanding the verdict, holding that the *Noerr–Pennington* doctrine[5] required that the jury's verdict be set aside. *See id.* at 942. On appeal, the Second Circuit vacated the trial court's decision, holding that *Noerr–Pennington* immunity should not be extended "to lobbying activities directed toward a 'quasi-legislative' body such as the NFPA." *See id.* The court of appeals also rejected Allied's cross appeal which sought a declaration that its activities were not a restraint of trade as a matter of law. *See id.* at 946–47. The Second Circuit held that although Allied tactics were in literal compliance with the NFPA's rules, "Allied violated the integrity of the NFPA's procedures ... for the sole purpose of achieving an anticompetitive result—the exclusion of [Indian Head's product] from the market place." *See id.*

International argues that *Indian Head* controls here because the AABC Board "was packed with competitors of International, who stood to benefit personally from [its] expulsion" and because Cox, another alleged competitor of International, participated in AABC's investigation. (Pl.'s Mem. in Supp. at 8.) International's argument, based solely on conclusory allegations, is not persuasive. International has failed to show that its expulsion was the result of egregious conduct comparable to the facts in *Indian Head.* First, there is no evidence that AABC's Board was "packed" with competitors. With no indication to the contrary, it appears that the Board members were duly elected in compliance with AABC's bylaws and with no ulterior motives to exclude competition. International fails to even

identify specific Board members and their alleged affiliation with firms that compete in International's market. Moreover, International concedes that Sufka, the Executive Director of AABC who initiated and oversaw the investigation of International, had no affiliation with any competitor. (Pl.'s Mem. in Supp. at 7.) In sum, there is no indication that International's expulsion was the result of anticompetitive bias on the part AABC's Board. Instead, it appears that International's expulsion occurred in compliance with AABC's bylaws and, more importantly, only in response to International's unreasonable conduct, both on the Project and in response to AABC's legitimate inquiries. *See Pretz v. Holstein Friesian Assoc. of America,* 698 F.Supp. 1531, 1540 (D.Kan.1988) (noting that procedural safeguards, though not determinative, suggest reasonableness of a defendant's restraint). International may have the opportunity to show otherwise at trial, but for now, the record does not support International's assertions.

And while the action of Cox, an alleged competitor, to distribute business cards at a meeting raises questions, that alone, especially in light of International's flouting of AABC's bylaws, is not enough to show that AABC's expulsion was tainted or violated the antitrust laws. *See Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549, 558 (7th Cir. 1980) ("a loss by the plaintiff of a single contract with a single purchaser is simply not equivalent to a deleterious effect on the market."). The court also notes that Cox swears that his firm does not directly compete with International (Def.'s Mem. in Opp'n, at Ex. 23); International's failure to even attempt to define the relevant market allows the court to not question Cox's averment. Finally, the court again emphasizes that International has failed to show that membership in AABC is essential to compete, unlike the model code approval sought in *Indian Head.*

---

5. The *Noerr–Pennington* Doctrine is not at issue here. Roughly speaking, the doctrine defines the boundary between an industry's concerted governmental lobbying efforts, which are legal, and "abuses of administrative or judicial processes that may result in antitrust violations." *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497

(1988); *see also Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

### 3. *Hydrolevel*

The third case that International relies upon is *Hydrolevel*, 456 U.S. at 579, 102 S.Ct. 1935 (1982), a case with facts similar to those in *Indian Head*. In *Hydrolevel*, the plaintiff, Hydrolevel, Inc. ("Hydrolevel"), developed an improved fuel cutoff device for use in boilers. *See id.* at 559, 102 S.Ct. 1935. Based on the improved device, Hydrolevel received business from a client that had previously purchased the product of the dominant competitor in the market, McDonnell & Miller ("M & M").

M & M was a member of the American Society of Mechanical Engineers ("ASME"), which published the industry's highly-influential model code. *See id.* at 559–60, 102 S.Ct. 1935. The model code was adopted by federal regulations, 46 states, and all but one of the Canadian provinces. *See id.* at 559, 102 S.Ct. 1935. An executive of M & M sat as vice-chairman of the ASME subcommittee that wrote the segment of the model code governing fuel cutoff devices. *See id.* Sensing that Hydrolevel's device would intrude into M & M's market share, the M & M executive, in his capacity as vice-chairman of the subcommittee, participated in the drafting of an unsupported and inconsistent statement that condemned Hydrolevel's device as unsafe under ASME's standards. *See id.* at 561–62, 102 S.Ct. 1935. Based on that statement, M & M orchestrated an effective publicity campaign that said Hydrolevel's device violated ASME's model code; consequently, Hydrolevel's business suffered. *See id.* at 563, 102 S.Ct. 1935. In response to Hydrolevel's ensuing complaints, ASME initiated an investigation which ultimately concluded that no wrongdoing had occurred. *See id.* at 563–64, 102 S.Ct. 1935. Hydrolevel then filed suit against M & M and ASME, alleging violations of §§ 1 and 2 of the Sherman Act. *See id.* at 564, 102 S.Ct. 1935. After M & M settled the suit with Hydrolevel, the case went to trial against ASME. The jury returned a verdict in favor of Hydrolevel, which the Second Circuit subsequently affirmed. *See id.* at 565, 102 S.Ct. 1935.

On a writ of certiorari, the issue before the Supreme Court was whether ASME could be held liable "under the antitrust laws for the acts of its agents performed with apparent authority." *See id.* at 559, 102 S.Ct. 1935.

The Court answered in the affirmative, concluding that "ASME's liability under a theory of apparent authority is consistent with the intent behind the antitrust laws." *See id.* at 570–71, 102 S.Ct. 1935. The Court reasoned that ASME's agents had the power to restrain competition because ASME was considered to be "an extra-governmental agency" based on the tremendous influence of its model code. *See id.* The Court also recognized that "a standard-setting organization like ASME can be rife with opportunity for anticompetitive activity" because many of ASME's officials were affiliated with members in competition. *See id.* at 571, 102 S.Ct. 1935. Moreover, the Court determined that whether ASME's agents intended to benefit ASME was irrelevant because they had the ability to "exercise economic power." *See id.* at 573–74, 102 S.Ct. 1935.

International argues that the facts in *Hydrolevel* are analogous to the facts at bar. Specifically, International asserts that one report which contributed to its eventual expulsion was inconsistent and generated by a competitor. (Pl.'s Mem. in Supp. at 9.) Initially, the court notes that Hydrolevel was primarily a case addressing the scope of agency under the Sherman Act. In any event, International's allegations are unsupported and insufficient in light of the substantial contravening evidence that suggests that International's overall performance received numerous complaints. International ignores those parts of the record and instead concludes that the problems incurred on the Project were all caused by conspirators seeking to eliminate competition. In fact, however, the record indicates that AABC repeatedly intervened on International's behalf in an effort to allow it to complete the Project. AABC's directive on the Project appeared to be three-fold: (1) to respond to O & P's complaints pursuant to the Guaranty; (2) to reach a resolution with O & P while acting in International's interests; and (3) to preserve the integrity of AABC. None of these aims are anticompetitive and there is no indication of covert activity by AABC in its investigation. Unlike the facts in *Hydrolevel*, there are no facts here suggesting: (1) that a competitor subverted any AABC procedure; or (2) that the act of expulsion by AABC

would effectively paralyze International's ability to compete or frustrate overall competition.

█ Based on the series of Supreme Court cases involving alleged antitrust violations by trade and professional associations, it is clear that the conduct of those organizations "has some potential to violate the antitrust laws." *See Sanjuan,* 40 F.3d at 251 (collecting cases). On that same note, however, "a trade association is not by its nature a 'walking conspiracy,'" *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 397 (7th Cir.1993) (citations and internal quotation marks omitted.), and "[t]he antitrust laws are not 'panacea[s] for all business affronts which seem to fit nowhere else.'" *ECOS Electronics Corp. v. Underwriters Laboratories,* 743 F.2d 498, 501 (7th Cir.1984) (*quoting Scranton Construction Co. v. Litton Industries Leasing Corp.* 494 F.2d 778, 783 (5th Cir.1974)). "Animosity, even if rephrased as 'anticompetitive effect,' is not illegal without illegal anticompetitive effects." *Schachar v. American Academy of Ophthalmology, Inc.,* 870 F.2d 397, 400 (7th Cir. 1989). It is injury to the market, not injury to an individual competitor, that violates the antitrust laws. *See Wigod v. Chicago Mercantile Exchange,* 981 F.2d 1510, 1515 (7th Cir.1992); *see also Martin,* 697 F.Supp. 997, 1003; *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 846 F.2d 284, 293 (5th Cir.1988).

International has not shown that its expulsion had an adverse impact on competition in the testing and balancing industry. *See Martin,* 697 F.Supp. at 1004–05. The expulsion of a noncomplying member is "the normal method by which a private association enforces its rules." *Vogel,* 744 F.2d at 600; *see also Northwest Wholesale,* 472 U.S. at 296, 105 S.Ct. 2613 (An association "must establish and enforce reasonable rules in order to function effectively."). By preventing AABC from enforcing its bylaws, an injunction would only encourage members to ignore the association's standards. *See Gen'l Leaseways,* 744 F.2d at 597. The integrity of AABC would consequently suffer. *See Martin,* 697 F.Supp. at 1004–05. "It has long been recognized that the establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations."

*Consolidated Metal Products, Inc.,* 846 F.2d at 294. In light of these considerations, International has not shown the unreasonableness of AABC's action; it may yet be able to do so at trial. *See Vogel,* 744 F.2d at 604 (emphasizing that the denial of a preliminary injunction does not serve to "prejudge the trial."). For now, however, the court concludes that International has not met its burden to show that it will likely succeed on the merits. Accordingly, the court need not reach the remaining elements necessary for a preliminary injunction to issue. *See Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359, 361 (7th Cir.1993). International's motion for a preliminary injunction is hence denied.

## III. CONCLUSION

For the foregoing reasons, International's motion for a preliminary injunction is denied.

IT IS SO ORDERED.